WHITEHOUSE HOTEL LIMITED PARTNERSHIP, QHR HOLDINGS—NEW ORLEANS, LTD., TAX MATTERS PARTNER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT*

Docket No. 12104–03.          Filed October 23, 2012.

On remand from the U.S. Court of Appeals for the Fifth Circuit for further proceedings in accordance with its opinion in *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 615 F.3d 321 (5th Cir. 2010), *vacating and remanding* 131 T.C. 112 (2008), we reconsider the value of the qualified conservation contribution made by W and whether, on account of that contribution, W is subject to an accuracy-related penalty on account of a substantial or gross valuation misstatement.

1. *Held*: Value of contribution determined: deduction overstated.

---

*This Opinion supplements our Opinion in *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 131 T.C. 112 (2008), *vacated and remanded*, 615 F.3d 321 (5th Cir. 2010).

2. *Held*, *further*, overstatement is gross valuation misstatement.

3. *Held*, *further*, accuracy-related penalty applicable because reasonable cause for underpayment of tax not shown.

*Gary J. Elkins*, *Yvonne Chalker*, and *Thomas M. Beh*, for petitioner.

*Jeffrey S. Luechtefeld*, for respondent.

CONTENTS

SUPPLEMENTAL OPINION ................................................... 306

Discussion ..................................................................... 314

I.   Introduction ............................................................... 314

II.  Approaches to Valuation .............................................. 315

  A.  Cost Approach ......................................................... 315
    1.  In General ......................................................... 315
    2.  Comparing Petitioner's Historic Cost to Mr. Roddewig's Cost Estimate .................................................. 318
    3.  Terra Cotta Reproduction Cost ............................... 318
    4.  External Obsolescence ......................................... 319
    5.  Land Value ...................................................... 320
    6.  Conclusion ...................................................... 321
  B.  Income Approach ..................................................... 321
    1.  Introduction .................................................... 321
    2.  In General ....................................................... 321
    3.  Conclusion ...................................................... 326
  C.  Comparable-Sales Approach ....................................... 328
    1.  Introduction .................................................... 328
    2.  Disregard of Sales of Nonlocal Comparable Properties ........ 329
    3.  Highest and Best Use .......................................... 330
    4.  Second-Best Use ............................................... 332
    5.  Conclusion ...................................................... 336

III. Effect of the Servitude ................................................. 337

  A.  Introduction .......................................................... 337
  B.  The Conveyance ...................................................... 340
    1.  Introduction .................................................... 340
    2.  Parties' Arguments ............................................ 342
    3.  Discussion ...................................................... 342
  C.  Conclusion ........................................................... 347

IV.  Valuation of the Servitude ............................................ 347

V.   Valuation Misstatement Penalty ..................................... 348

  A.  Introduction .......................................................... 348
  B.  Discussion ............................................................ 350

1. Testimony of Mr. Drawbridge .................................................. 350
2. Court of Appeals' Counsel ...................................................... 351
3. Petitioner's Burden .................................................................. 352
4. The Revac Appraisal ............................................................... 355
5. Form 8283 ............................................................................... 356
6. Investigation ........................................................................... 357
7. Reliance on Advice and Counsel ........................................... 359
8. Conclusion .............................................................................. 361
C. Conclusion ..................................................................................... 362

VI. Conclusion ...................................................................................... 362

APPENDIX .............................................................................................. 362

## SUPPLEMENTAL OPINION

HALPERN, *Judge*: This case is before us on remand from the U.S. Court of Appeals for the Fifth Circuit (Court of Appeals) for further proceedings in accordance with its opinion in *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 615 F.3d 321 (5th Cir. 2010) (*Whitehouse II*), *vacating and remanding* 131 T.C. 112 (2008) (*Whitehouse I*). The case arose on account of the parties' disagreement as to the value of the qualified conservation contribution made by Whitehouse Hotel Limited Partnership (partnership) when, in 1997, it conveyed a qualified real property interest, viz, a perpetual conservation restriction, to Preservation Alliance of New Orleans, Inc., d.b.a. Preservation Resource Center of New Orleans (PRC), a Louisiana nonprofit corporation. The Court of Appeals instructed us to reconsider (1) our finding as to the value of the contribution and (2) our determination sustaining an accuracy-related penalty.

At our request, the parties filed supplemental briefs in which they were to address both issues that we had identified and issues that they might identify.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1997, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### *Background*

We incorporate herein by this reference the facts that, under the heading FINDINGS OF FACT, we found in *Whitehouse I*, 131 T.C. at 115–120 (including the stipulation of facts,

supplemental stipulation of facts, and second supplemental stipulation of facts), which we do not believe the Court of Appeals disturbed. We summarize pertinent facts and portions of our Opinion in *Whitehouse I* for the benefit of the reader.

*The Partnership, the Maison Blanche and Kress Buildings, the Ritz-Carlton Agreement*

The partnership is a Louisiana limited partnership formed in 1995. On December 21, 1995, the partnership acquired a parcel of improved real property in New Orleans, Louisiana, on the square (block) bordered by Canal, Burgundy, Iberville, and Dauphine Streets. Principally, the parcel consisted of a historic building, the Maison Blanche Building, built between 1907 and 1909, two annexes, one built in the 1920s and the other built in the 1950s, and the land under all. At the time the partnership acquired the parcel, the first through third floors of the Maison Blanche Building were under lease to Maison Blanche, Inc., for use as a department store. The lessee had previously prepaid rent for a term ending in 2004. The upper floors of the building were vacant. The partnership agreed to pay $6 million for the parcel plus additional amounts based on the partnership's "Net Cash Flow" and "Net Capital Proceeds". In September 1996, the partnership paid an additional $625,000 in cancellation of its obligation to pay those additional amounts and for other things. In September 1996, the partnership bought out the remaining term of the lease for $3,375,938 and obtained the right to use the Maison Blanche name.

The Maison Blanche Building consists of a base level and an eight-level U-shaped tower. Exterior street facades of the Maison Blanche Building consist almost entirely of glazed terra cotta; some interior portions of the building (e.g., interior courtyard areas) are primarily constructed of white glazed brick with less extensive terra cotta ornamentation. The Maison Blanche Building fronts on Canal Street.

The Maison Blanche Building is adjacent to the Vieux Carré (French Quarter) neighborhood of New Orleans. It is in both the Vieux Carré National Historic District and the Canal Street Historic District, which is part of the Central Business District. The Central Business District Historic Dis-

trict Landmark Commission determined that the Maison Blanche Building is a building of major architectural importance.

On February 19, 1997, the partnership and the Ritz-Carlton Hotel Co., L.L.C. (Ritz-Carlton), entered into agreements under which the partnership agreed to renovate the Maison Blanche Building and the as-yet-unacquired neighboring Kress Building and Ritz-Carlton agreed to operate a Ritz-Carlton Hotel in the renovated buildings. Ritz-Carlton was to receive certain fees and expense reimbursements in exchange for its services.

On or about October 30, 1997, the partnership purchased additional property in the same block as the Maison Blanche Building, including the Kress Building, which is adjacent to the Maison Blanche Building, and the Kress parking garage. The Kress Building was built in 1910, consists of six levels, and fronts on Canal Street. The partnership paid $3.4 million for the additional property, $1 million allocable to the Kress Building.

Treating all of the partnership's expenditures to assemble the Maison Blanche-Kress parcel as having been made in December 1995, the partnership paid $11,000,938 ($6,625,000 + $1,000,000 + $3,375,938) to assemble the parcel.

The Maison Blanche Building, its annexes, the Kress Building, and the Kress parking garage were ultimately developed into a 452-room Ritz-Carlton Hotel and into other hotel facilities. The Ritz-Carlton Hotel, and associated facilities, commenced operations on October 6, 2000.

*The Servitude*

On December 29, 1997 (valuation date), the partnership conveyed certain of its rights in the Maison Blanche Building to PRC. The conveyance was by "Act of Donation of Perpetual Real Rights" (conveyance). A copy of the conveyance, excluding exhibits, is appended hereto. In summary, the conveyance provides that: (1) the owner (i.e., the partnership) intends to convert the Maison Blanche Building (described as the "Improvement" (improvement), to distinguish it from the underlying land) into a hotel; (2) there is no servitude or other encumbrance that would limit the rights conveyed; (3)

the rights conveyed (described as the "Servitude" (servitude)) are conveyed in perpetuity; (4) the servitude relates to certain exterior surfaces of the improvement (referred to as the "Facade" (facade)); (5) the owner will maintain the facade in a good and sound state of repair; (6) without permission, the owner will do nothing in or to the facade that would alter its appearance; and (7) PRC has the right to require the owner to maintain the facade. On December 29, 1997, the conveyance was filed for registry in the conveyance records of the parish of Orleans.

*La. Rev. Stat. Ann. sec. 9:1252 (2008)*

Petitioner tax matters partner claims that the servitude was created in accordance with the express statutory provisions of La. Rev. Stat. Ann. sec. 9:1252. La. Rev. Stat. Ann. sec. 9:1252 provides for the creation of a perpetual real right burdening the whole or any part of immovable property, including but not limited to its facade, in favor of an entity formed exclusively for certain public purposes. Pertinent portions of that section are set out in the margin.[1]

*The Charitable Contribution and Respondent's Examination*

On account of the conveyance of the servitude to PRC, the partnership claimed a charitable contribution deduction of

---

[1] La. Rev. Stat. Ann. sec. 9:1252 (2008) provides in part:

*Creation of real right for educational, charitable, or historic purposes*

A. The owner of immovable property may create a perpetual real right burdening the whole or any part thereof of that immovable property, including, but not limited to, the facade, exterior, roof, or front of any improvements thereon to any corporation, trust, community chest, fund, or foundation, organized and operated exclusively for religious, scientific, literary, charitable, educational, or historical purposes, no part of the net earnings of which inure to the benefit of any private shareholder or individual, or to the United States, the state of Louisiana, or any political subdivision of any of the foregoing. A real right established pursuant hereto may additionally obligate the owner of the immovable property as is necessary to fully execute the rights granted herein.

B. A real right created pursuant to this Section shall be binding on the grantor, his heirs, successors, assigns, and all subsequent owners of the immovable property, regardless of the fact that the grantee does not own or possess any interest in a neighboring estate or the fact that the real right is granted to the grantee and not to the estate of the grantee, the fact that the real right was not created as a part of a common development or building plan, devised by an ancestor in title of the grantor.

C. A real right created under the authority of this Section shall be granted by authentic act and shall be effective against third parties when filed for registry in the conveyance records of the parish in which the immovable property is located. Any right or obligation imposed on the owner of the immovable property by the real right created pursuant hereto, including any affirmative obligation established therein, shall be enforceable by the grantee through judicial proceeding by actions for injunctions or damages brought by the grantee.

$7.445 million on its 1997 Form 1065, U.S. Partnership Return of Income (1997 Form 1065). Respondent examined the 1997 Form 1065 and determined that the $7.445 million charitable contribution deduction should be reduced by $6.295 million since the partnership had not established that the loss of value on account of the conveyance of the servitude exceeded $1.15 million. On account of the size of his reduction in value, respondent determined that an accuracy-related penalty under section 6662(a) is applicable. This proceeding, in which petitioner challenges both respondent's reduction in value of the charitable contribution deduction and the accuracy-related penalty, followed.

*Expert Testimony as to the Value of the Servitude*

The parties agree that the partnership is entitled to a charitable contribution deduction for 1997 on account of its conveying the servitude to PRC. They disagree as to the amount of the deduction because they disagree as to the value of the servitude. The parties relied exclusively on expert testimony to establish the value of the servitude.

Petitioner called as its expert witness Richard J. Roddewig, whom we accepted as an expert with respect to (1) the valuation of conservation easements and (2) the site selection, feasibility, and valuation of hotels. Mr. Roddewig is a real estate appraiser and attorney. He is a member of the Appraisal Institute, and he holds its MAI designation. He conducts his appraisal business from Chicago, Illinois. He obtained a temporary license from the State of Louisiana as a certified general real estate appraiser for the purpose of making his appraisal here under consideration. Before reaching his conclusion as to the loss in value occasioned by the partnership's conveyance of the servitude to PRC (sometimes, value of the servitude) he spent four to six days in New Orleans. His staff made additional visits. Mr. Roddewig's previous appraisal experience in Louisiana consisted of two or three preliminary appraisals made in the early 1980s of preservation easement grants in New Orleans and a market feasibility study for a site in Lafayette, Louisiana. We received his written report, dated August 9, 2005, as his direct testimony.

Respondent called as his expert witness Richard Dunbar Argote, whom we accepted as an expert with respect to commercial real estate appraisal. Mr. Argote is licensed by the State of Louisiana as a certified general real estate appraiser and as a real estate broker. Like Mr. Roddewig, he is a member of the Appraisal Institute and holds its MAI designation. Mr. Argote has been appraising real estate in Louisiana for over 25 years. From 1990 to 2000, he appraised between 50 and 70 buildings in and around New Orleans that were to be used as or converted into hotels. About 85% of those appraisals were of buildings located within the Central Business District or the Vieux Carré. Over the years, Mr. Argote has appraised every building within the same square as the Maison Blanche Building. He has appraised the Maison Blanche Building on three prior occasions. After addressing objections, we received his written report, dated October 31, 2006, as his direct testimony.

Each expert arrived at an opinion as to the fair market value of the servitude by making the before and after comparison contemplated by the applicable regulations. *See* sec. 1.170A–14(h)(3)(i), Income Tax Regs. Petitioner's expert, Mr. Roddewig, determined the requisite before and after values in three different ways. He relied primarily on a reproduction cost approach and an income approach, but he also used, in part, a comparable-sales approach. He determined that the appropriate parcel of property to value was the Maison Blanche Building, the 1920s and 1950s annexes, and the Kress Building (Maison Blanche-Kress parcel). He determined the following before- and after-restriction values:

### Before-restriction values

| | |
|---|---|
| Cost approach | $43,000,000 |
| Adjusted income approach | 41,000,000 |
| Comparable-sales approach | 40,000,000 |

### After-restriction values

| | |
|---|---|
| Cost approach | $35,500,000 |
| Adjusted income approach | 28,000,000 |
| Comparable-sales approach | - - - |

He determined no after-restriction comparable-sales-approach value because he found no directly relevant after-restriction sales. Taking into account his three approaches, but giving significant weight to the adjusted income approach because of the purported uniqueness in New Orleans of the Maison Blanche-Kress parcel, he reached the following ultimate determinations as to the before- and after-restriction values of the Maison Blanche-Kress parcel and the value of the servitude:

### *Value of the servitude*

| | |
|---|---|
| Before-restriction value ................................ | $41,000,000 |
| After-restriction value ................................. | 31,000,000 |
| Difference; i.e., fair market value of the servitude .................................................... | 10,000,000 |

Respondent's expert, Mr. Argote, relied exclusively on a comparable-sales approach. He concluded that the before-restriction value of the Maison Blanche Building was $10.3 million and the after-restriction value was $10.3 million. He determined that the value of the servitude was zero. Notwithstanding Mr. Argote's opinion that the value of the servitude was zero, respondent did not ask that we find that the value was any less than the $1.15 million he determined in his examination.

### *Highest and Best Use*

In *Whitehouse I*, we acknowledged that the fair market value of property is determined by taking into account the highest and best use of that property on the valuation date. *Whitehouse I*, 131 T.C. at 130 (citing *Stanley Works v. Commissioner*, 87 T.C. 389, 400 (1986)). We explained that the experts differed on whether the conveyance changed the highest and best use of the property each valued. We stated:

Mr. Roddewig determined the highest and best use of the Maison Blanche-Kress parcel before the conveyance was a mixed use development, including a Ritz-Carlton Hotel with 512 rooms (60 of them above the Kress Building), an additional all-suites hotel with approximately 268 rooms, and retail use on the first two floors and mezzanine of the Maison Blanche Building. He determined that the highest and best use of the Maison Blanche-Kress parcel after the conveyance was different in that: "The

opportunity to add up to 60 additional hotel rooms [above the Kress Building] * * * [had] been eliminated." That difference contributed to his conclusion that, under both the cost and income approaches, the fair market value of the Maison Blanche-Kress parcel was reduced on account of the conveyance. Mr. Argote believes the highest and best use of the Maison Blanche Building both before and after the conveyance was use as a hotel (not necessarily a Ritz-Carlton Hotel) with retail space. [*Whitehouse I*, 131 T.C. at 130–131.]

Essential to Mr. Roddewig's opinion was his belief that the conveyance eliminated the possibility of constructing 60 hotel rooms above the Kress Building. Considering the question to be one of local (Louisiana) law, we found that, on the evidence before us, the conveyance created no charge on the Kress Building in favor of PRC. *Id.* at 134. Therefore, we stated: "Petitioner has failed to show that the highest and best use of the Maison Blanche-Kress parcel after the conveyance differed from its highest and best use before the conveyance on account of the conveyance's depriving the partnership of the ability to add 60 hotel rooms above the Kress Building." *Id.* at 135. We concluded: "Mr. Roddewig erred in his opinion that the highest and best use of the Maison Blanche-Kress parcel differed after the conveyance on account of the partnership's disability to add 60 hotel rooms above the Kress Building." *Id.* We stated that we would take that error into account in considering his valuation conclusions. *Id.*

*Our Analysis of Value*

Mr. Roddewig failed to persuade us that $43 million and $35.5 million are reliable estimates of the before- and after-restriction reproduction costs, respectively, of the Maison Blanche-Kress parcel, or that the resulting value of the servitude is $7.5 million. We therefore disregarded petitioner's cost approach in determining the value of the servitude. *Id.* at 152. Because we believed that (1) that there was a risk of error inherent in the income approach as applied by Mr. Roddewig and (2) we had reliable alternative evidence of value arrived at by the comparable-sales approach, we also rejected petitioner's income approach in determining the value of the servitude. *Id.* at 156. We relied exclusively on the comparable-sales approach to determine the value of the servitude. *Id.* at 171–172. Of note, we rejected Mr.

Roddewig's use of nonlocal comparables, *id.* at 158, and his adjustment for the higher room rates expected at a Ritz-Carlton Hotel (price point adjustment), *id.* at 159. We found a before-restriction value for the Maison Blanche Building under the comparable-sales approach of $12,092,301. *Id.* at 168. We accepted Mr. Argote's determination that the after-restriction value of the Maison Blanche Building under the comparable-sales approach is $10.3 million, and found accordingly. *Id.* at 171. We found the difference, $1,792,301, to be the fair market value of the servitude on the valuation date. *Id.* at 172.

*Valuation-Misstatement Penalty*

On the basis of our determination of the value of the servitude, we concluded that the partnership had overstated the value of the servitude on the 1997 Form 1065 by more than 400%, and, therefore, it had made a gross valuation misstatement. *Id.* at 176. We found no reasonable cause for the misstatement. *Id.* We therefore sustained application of an accuracy-related penalty under section 6662(a) on the basis of a gross valuation misstatement. *Id.*

*Discussion*

I. *Introduction*

"In sum", the Court of Appeals stated, we

erred in declining to consider the Maison Blanche and Kress buildings' highest and best use in the light of both the reasonable and probable condominium regime and the reasonable and probable combination of those buildings into a single functional unit, both of which foreclosed the realistic possibility, for valuation purposes, that the Kress and Maison Blanche buildings could come under separate ownership. This combination affected the buildings' fair market value. [*Whitehouse II*, 615 F.3d at 340.]

It instructed us as follows as to our tasks on remand:

The effect of the easement's impact on the property's fair market value, such as prohibiting building 60 additional rooms on top of the Kress building, is a question of fact for the tax court to decide on remand. Therefore, we vacate its valuation and remand for reconsideration of the easement's value. As discussed *supra*, in making this valuation on remand, the tax court should, among other things, reconsider the experts' reports and valuation methods (including, inter alia, using non-local comparables) and

their conclusions regarding highest and best use as a luxury or non-luxury hotel. [*Id.*]

It also included among our tasks reconsideration, if necessary, of our penalty determination. *Id.* at 341.

We shall undertake our tasks as follows. First, we shall reconsider whether the before and after values of the encumbered property are best arrived at under the comparable-sales approach to valuation rather than the cost approach or the income approach. In doing so, we shall explain our reliance in applying the comparable-sales approach on properties in the Vieux Carré and the Central Business District, which implicates our consideration of the highest and best use of the Maison Blanche Building. Second, we shall explain our conclusion that the servitude did not deprive the partnership of the ability to add stories above the Kress Building. We shall, however, make an additional finding on the bases that, (1) the servitude did so deprive the partnership and, (2) the pending combination of the Maison Blanche and Kress Buildings made unlikely separate ownership of the two buildings. Finally, we shall revisit the penalty.

## II. *Approaches to Valuation*

### A. *Cost Approach*

#### 1. *In General*

We have reconsidered Mr. Roddewig's testimony regarding the value of the servitude under the reproduction cost approach and, because we find it unreliable, continue to accord it no weight.

In its supplemental brief, petitioner suggests that in *Whitehouse I* we may have implied that the reproduction cost "approach should never be used to value historic properties". That is not our position. In *Whitehouse I*, 131 T.C. at 147, we stated:

We have in the past questioned the suitability of the reproduction cost approach when applied to value older, historic structures. *Dorsey v. Commissioner*, T.C. Memo. 1990–242; *Losch v. Commissioner*, T.C. Memo. 1988–230. For example, reproduction cost is of little assistance if no one would think of reproducing the property. *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 403 (1949). * * *

With respect to the Maison Blanche Building, we continued:

The Maison Blanche Building was built between 1907 and 1909. It is true that the servitude obligates the building's owner to repair the facade and structural elements of the building if they are damaged. In the case of a total loss or destruction of the building, however, the servitude provides: "Owner shall promptly remove all debris and trash and properly maintain the Land. Owner must obtain Donee's written approval of and prior consent to any construction or reconstruction of * * * [the Maison Blanche Building], as provided herein. * * * [*Whitehouse I*, 131 T.C. at 147.]

We concluded: "Petitioner has failed to convince us that, notwithstanding the historic significance of the Maison Blanche Building, the owners of the building would want to, or would be required to, reconstruct that 100-year-old structure if it were destroyed." *Id.*

The simple explanation for petitioner's failure of proof on that score is that it cannot show that it would be a reasonable business venture to reproduce so old a building. Indeed, the reproduction cost approach is in general problematic for determining the value of a historic structure. The problem is described thus in the section of the Powell treatise on real property dealing with how valuation and appraisal methods vary for conservation easements:

The cost approach to valuation encounters substantial difficulties when applied to historic structures (virtually its only application in the conservation easement context). The reproduction cost of an historic building usually bears little relationship to its present economic value. Such cost is usually far in excess of the cost of construction of a similarly sized modern structure, and may reflect the price of materials and workmanship that are no longer readily available. * * * [Richard R. Powell, Powell on Real Property, sec. 34A.06, at 34A–54 (M. Wolf ed. 2012).]

The treatise concludes its discussion of the appropriateness of the reproduction cost approach to valuing historic improvements to land as follows:

[T]his method of valuation has substantial disadvantages in the best of circumstances. Its utility has been questioned and it should be used with care, if it is used at all, in connection with the appraisal of structures subject to conservation easements.[19]

Footnote 19. One authority has concluded, "The assumption, often reflected in the opinions of the highest courts, that replaceable property is *usually* worth its replacement cost, minus conventional deductions for depreciation, is utterly unwarranted and is constantly belied by business experience." Bonbright, The Valuation of Property 176 (1937) (emphasis in original). As a general proposition, "[R]eproduction cost should be utilized only in those limited instances in which no other method of valuation will

yield a legally and economically realistic value for the property." (*Great Atlantic and Pacific Tea Co. v. Kiernan*, 42 N.Y.2d 236, 242, 397 N.Y.S.2d 718, 723, 366 N.E.2d 808, 812 (1977)).
  [*Id.*]

In accord with the authority cited by the Powell treatise, the Court of Appeals has said that, for the reproduction cost approach to be appropriate, "there must be a showing that substantial reproduction would be a reasonable business venture". *United States v. Benning Housing Corp.*, 276 F.2d 248, 250 (5th Cir. 1960). The Court of Appeals further observed that, where the reproduction cost approach is inapposite, reproduction cost evidence generally should be excluded from jury trials (such as in condemnation proceedings) because such evidence "almost invariably tends to inflate valuation." *Id.* (fn. ref. omitted). "This is so", the court continued, "because the reproduction cost of a structure sets an absolute ceiling on the market price of that structure, a ceiling which may not be, and most frequently is not, even approached in actual market negotiations." *Id.* (fn. ref. omitted).

Following that line of reasoning, the Court of Appeals for the Eighth Circuit has stated the rule more generally: "For the reproduction cost appropriately to have an impact on the value equation, the taxpayer must establish 'a probative correlation between [it] and fair market value.'" *Estate of Palmer v. Commissioner*, 839 F.2d 420, 424 (8th Cir. 1988) (quoting *Rainier Cos. v. Commissioner*, T.C. Memo. 1977–351), *rev'g and remanding* 86 T.C. 66 (1986); *see also Crocker v. Commissioner*, T.C. Memo. 1998–204 (same with respect to replacement cost, citing *Estate of Palmer*).

Thus, without a showing by petitioner that reconstruction of the Maison Blanche Building, if destroyed, would be a reasonable business venture, petitioner has failed to convince us that there is a probative correlation between Mr. Roddewig's estimate of the reproduction cost of the Maison Blanche Building and the fair market value of that property. And while that might be a sufficient basis to disregard Mr. Roddewig's testimony concerning cost, we believe that there are additional reasons for doing so, which we discussed in *Whitehouse I*, and which we summarize here.

### 2. *Comparing Petitioner's Historic Cost to Mr. Roddewig's Cost Estimate*

In *Whitehouse I*, 131 T.C. at 148–150, we questioned whether Mr. Roddewig's estimate of a before-restriction value of $43 million for the Maison Blanche-Kress parcel correlated with its market value because of the huge difference between his estimate of its before-restriction reproduction cost—$43 million—and what the partnership actually paid for the parcel no more than two years earlier—slightly more than $11 million. After reviewing his list of reasons for the increase in value of the Maison Blanche Building, we stated: "Simply put, we cannot reconcile Mr. Roddewig's report of a New Orleans real estate market enjoying, at best, stable growth with his explanation of 291-percent appreciation in the value of the Maison Blanche-Kress parcel." *Id.* at 149–150. We are still of that conclusion.[2]

### 3. *Terra Cotta Reproduction Cost*

Mr. Roddewig was of the opinion that the reproduction cost of the Maison Blanche Building shell and the Kress Building on the valuation date, before depreciation and obsolescence, was $54.3 million. Of that total estimated cost of reproduction, he attributed $42.025 million to reproducing the terra cotta facade on the Maison Blanche Building. Because we found that he insufficiently supported his terra cotta reproduction cost estimate (his testimony as to that cost being the only evidence of it in the record), and because that estimate was the major element of his reproduction cost estimate, we gave no weight to his conclusion that the total cost to reproduce the Maison Blanche Building shell and the Kress Building is $54.3 million. Mindful of the fact that, since the conveyance, the partnership has spent $7.792 million repairing and restoring the terra cotta facade, plus $421,000 to repair damage from Hurricane Katrina, we still accord Mr. Roddewig's testimony as to the reproduction cost of the Maison Blanche Building shell and the Kress Building no

---

[2] In passing, we note that, in considering the correlation, we did not take into account either expert's opinion as to the highest and best use of the Maison Blanche-Kress parcel; we merely considered the relative prices as evidence of the correlation (or lack thereof) between the time-adjusted cost of acquiring the parcel and Mr. Roddewig's estimate of the cost of reproducing it.

weight because of the inadequacy of his testimony as to the terra cotta reproduction cost. [3]

### 4. *External Obsolescence*

In both his before- and after-restriction calculations of reproduction cost, Mr. Roddewig deducted an amount to reflect external obsolescence: 15% of the before-restriction depreciated reproduction cost and 30% of the after-restriction depreciated reproduction cost ($6,516,000 and $13,846,500, respectively). He described the before-restriction external obsolescence as resulting from the designation of the Maison Blanche-Kress parcel as part of the Canal Street Historic District. He described his doubling of that figure to reflect after-restriction external obsolescence as resulting from his judgment of the added burden imposed on the owner of the parcel by the servitude. We refused to rely on his judgment alone that the enforcement of the provisions of the servitude double the cost of external obsolescence. We explained that our lack of confidence in his judgment was based on our impression that his $43 million estimate of the before-restriction value of the Maison Blanche-Kress parcel defied reason.

---

[3] For convenience, we set forth the analysis of his testimony that we made in *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 131 T.C. 112, 150 (2008) (*Whitehouse I*), *vacated and remanded*, 615 F.3d 321 (5th Cir. 2010):

His testimony is based upon estimates which he obtained from terra cotta industry specialists, rather than from his own experience.[14] The estimated cost is not detailed or broken down, making it impossible for us to know what is and is not included and how the cost was determined. While the terra cotta specialists he relied on may be highly qualified, he has not articulated the facts relied on by, and the reasoning of, those specialists, which prevents us from properly evaluating both their and his conclusions. See *Estate of Palmer v. Commissioner*, T.C. Memo. 1992–48 (quoting 15 Mertens, Law of Federal Income Taxation, sec. 59.08, at 26 (1989)).[15]

[14] Mr. Roddewig's testimony with respect to how many specialists he relied on is inconsistent. Note 5 to the table in his written report labeled "Segregated Cost Analysis: Before Preservation Easement Maison Blanche Hotel Complex (Ritz-Carlton Hotel)—Building Shell Only—As of December 29, 1997" explains that the terra cotta reproduction cost "has been estimated based on calculations from terra cotta specialists." Note 40 to that written report explains: "The costs used by us to calculate the reproduction cost of the Maison Blanche exterior were determined based upon multiple calls with Mr. Pete Pederson of Gladding McBean terra cotta between February 23 and March 4, 2005." We cannot determine how many terra cotta specialists Mr. Roddewig consulted. We shall continue to use the term "specialists" although we are uncertain as to whether there was one or more.

[15] 15 Mertens, Law of Federal Income Taxation, sec. 59.08, at 26 (1989):

A common fallacy in offering opinion evidence is to assume that the opinion is more important than the facts. To have any persuasive force, the opinion should be expressed by a person qualified in background, experience, and intelligence, and having familiarity with the property and the valuation problem involved. It should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based. The facts must corroborate the opinion, or the opinion will be discounted. [Fn. refs. omitted.]

*Whitehouse I*, 131 T.C. at 151–152. We added: "We need not rely on the unsupported opinion of an expert witness", citing *Holman v. Commissioner*, 130 T.C. 170, 213 (2008), *aff'd*, 601 F.3d 763 (8th Cir. 2010). *Id.* at 152. The relevant authority of the Court of Appeals is in accord. *E.g.*, *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("An expert's opinion must be supported to provide substantial evidence; * * * 'A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.'" (quoting *Archer v. Warren*, 118 S.W.3d 779, 782 (Tex. Ct. App. 2003))). We have reconsidered and do not believe we erred in questioning, and refusing to rely on, Mr. Roddewig's judgment that the enforcement of the provisions of the servitude doubles the cost of external obsolescence.

5. *Land Value*

In moving from his before- to his after-restriction value, Mr. Roddewig reduced his estimate of the cost of land by $2.5 million because the conveyance had reduced the partnership's interest in the Maison Blanche-Kress parcel to less than a fee simple interest and, he believed, the partnership had lost the right to construct 60 rooms above the Kress Building. We shall address his second reason *infra*. In *Whitehouse I*, 131 T.C. at 152, we conceded for the sake of argument that a servitude requiring maintenance of a building's facade would survive and affect the value of the underlying land if that land were wiped clean of the building. *Id.* His testimony that the price of each comparable should be adjusted down by 10% to reflect the effect of the servitude was supported only by his opinion, which we did not find persuasive and did not accept. *Id.* Here, we again cited *Holman v. Commissioner*, 130 T.C. at 213, signifying that we need not rely on the unsupported testimony of an expert witness. *Accord Guile*, 422 F.3d at 227. Additionally, as with our consideration of his testimony with respect to external obsolescence, we lack confidence in his judgment on account of what we consider to be his overvaluation of the before-restriction value of the Maison Blanche-Kress parcel. We continue not to accept his 10% downward adjustments.

6. *Conclusion*

We reject Mr. Roddewig's testimony regarding the value of the servitude under the reproduction cost approach not only because that approach is in general problematic for determining the value of a historic structure (and, in particular, problematic here, where petitioner has failed to show that reconstruction, if the Maison Blanche Building were destroyed, would be a reasonable business venture) but also because we lack confidence in some of Mr. Roddewig's unsupported conclusions.

Moreover, we need not (and should not) rely on a substantially flawed and inappropriate valuation method where we have another method that provides a more accurate valuation of the servitude, as discussed *infra*.

B. *Income Approach*

1. *Introduction*

In *Whitehouse I*, 131 T.C. at 156, we summed up our grounds for rejecting petitioner's income approach to valuing the servitude as follows: "The risk of error inherent in the income approach as applied by Mr. Roddewig in this case, together with the fact that we have reliable alternative evidence of value arrived at by the comparable sales approach, is sufficient grounds for us to reject the income approach, and we do." We have reconsidered and come to the same conclusion.

2. *In General*

While on the valuation date the partnership and Ritz-Carlton had entered into agreements under which (1) the partnership agreed to renovate the Maison Blanche and Kress Buildings and (2) Ritz-Carlton agreed to operate a hotel therein, on that date there had been no renovation and there was no hotel. Indeed, all that was valuable with respect to the Maison Blanche Building was its shell, since the rehabilitation plan for the building was to remove all interior partitions as well as mechanical and electrical systems. *Id.* at 136 n.11. The income approach to valuation is based on the premise that the subject property's market value is measured by the present value of the future income

its owners can expect to realize. *E.g.*, *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd without published opinion*, 921 F.2d 280 (9th Cir. 1991). The subject property's future cashflows are estimated, and the present value of those cashflows is determined on the basis of an appropriate risk-adjusted rate of return. *See, e.g.*, *Estate of Heck v. Commissioner*, T.C. Memo. 2002–34. Mr. Roddewig described the process as follows:

In our Income Approach "before" considering the preservation and conservation easement, the rehabilitation costs have been based upon the actual proposed rehabilitation costs as of December of 1997. Operating revenues, operating costs and expenses, and profits associated with the proposed Ritz-Carlton Hotel project have been determined based upon analysis of the actual real estate marketplace in the New Orleans CBD [Central Business District], and elsewhere, and then inserted into a computerized discounted cash flow model. The resulting discounted present value is the price that could be paid for the Maison Blanche Building, the 1950s Addition, and the Kress Building in their deteriorated condition prior to rehabilitation as of December of 1997, and before considering the preservation and conservation easement. The result is the most probable price that a purchaser would be willing to pay for the unrehabilitated Maison Blanche complex prior to considering the impact of the preservation easement.

In short, Mr. Roddewig input data to his computer model, and the output, he represents, is the "most probable price" that a willing buyer would be willing to pay for the Maison Blanche-Kress parcel sans the servitude.[4]

The seemingly mechanical nature of the process should not obscure the fact that Mr. Roddewig's estimate of "the most probable price" is a probabilistic expression (a point estimate) of value resulting from an analysis of a considerable number of underlying data. Even if we accept that, according to his analysis of the data, the model has generated the most probable price that a willing buyer would pay, how much confidence should we place in that estimate? How confident should we be that the most probable price that a willing buyer would pay is not substantially less (or more) than the price indicated by Mr. Roddewig's model? Many of the data

---

[4] The after-restriction approach is similar, but, as Mr. Roddewig testified, inputting to the model additional costs and delays due to the burden of the servitude and adjusting capitalization and discount rates to reflect new risks associated with imposition of the servitude. The indicated value of the servitude is, of course, the difference between the before- and after-restriction approaches.

Mr. Roddewig relied on (e.g., occupancy rates) were as yet unknown. He relied on industry data for many of his inputs (e.g., room revenues, food and beverage revenue, telephone revenue). Some risks are obvious: e.g., the hotel might not be finished on schedule;[5] occupancy might be less than expected; the hotel might not fetch $123,942,500 at the end of 2002 (ignoring the servitude). Moreover, in estimating construction costs and hotel receipts and expenses alone, Mr. Roddewig made hundreds of assumptions, involving amounts both large ($9,904,936 in construction period interest) and small ($4.50-a-night telephone revenue from occupied rooms), each carrying with it some risk of error. He has provided us with no measure of the overall risk of error in his conclusion of the most probable price that a willing buyer would pay. Our own calculations, *see Whitehouse I*, 131 T.C. at 154–156, show that relatively minor changes in only a few of his assumptions would have large bottom-line effects. Without some measure of the overall risk attendant to his model's output that we might examine, and with our own conclusions as to the sensitivity of his model's output to relatively minor changes, we were (and remain) hesitant to attach any weight to that output (i.e., most probable price that a willing buyer would pay), especially in the light of the availability of comparable-sales data as to value.[6]

Mr. Argote did not use the income approach. He testified that, as applied to the Maison Blanche Building, the income approach relied upon too many assumptions, thus making it prone to error. He believes (as we determined) that even a small change in estimated construction costs, the timing of those costs, the length of time to complete construction, estimated income, estimated expenses, capitalization rate, or discount rate could substantially affect the present value arrived at using a discounted cashflow analysis.

Petitioner in its supplemental brief points us to cases in which we approved the income approach to valuing income-

---

[5] And apparently it was not finished on schedule. Mr. Roddewig assumed that construction would end on December 31, 1999, and the hotel would open the next day, January 1, 2000. Petitioner makes no objection to respondent's proposed finding of fact that the hotel commenced operations on October 6, 2000, and we have so found.

[6] *See* Institute of Business Appraisers, "A Deep, Dark Secret", May 15, 2009, by Rand Curtiss, http://67.199.106.48/index/2009/05/15/a-deep-dark-secret/ (last visited October 15, 2012) (suggesting that, when the number of variables in a business valuation increases, the uncertainty of the value of the business as a whole increases because of the interrelationship of the variables).

generating properties. *E.g.*, *Gross v. Commissioner*, T.C. Memo. 1999–254 ("When properly applied, a discounted cash-flow analysis is a reliable tool for financial analysis."), *aff'd*, 272 F.3d 333 (6th Cir. 2001). Two of the cases that petitioner refers us to are cases in which we actually ignored the income approach (applied by at least one appraiser in each case) in determining the fair market value of an encumbrance: *Dorsey v. Commissioner*, T.C. Memo. 1990–242 (preferring acquisition cost to establish the pre-encumbrance value of the building and reducing it by 10% to reflect the loss in value attributable to the encumbrance; illustrating in an appendix how our result was approximately the same as under the taxpayer's expert's income approach), and *Hilborn v. Commissioner*, 85 T.C. 677, 698–700 (1985) (relying, in part, on each expert's testimony but not placing any weight on the value arrived at under the income method).

It is true that we have used the income approach (the subdivision method) to account for the loss of development potential resulting from the restrictions imposed by a conservation easement. *E.g.*, *Symington v. Commissioner*, 87 T.C. 892 (1986); *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010–283, *aff'd*, 493 Fed. Appx. 944 (10th Cir. 2012); *Clemens v. Commissioner*, T.C. Memo. 1992–436. In those instances, we found that the loss in value due to imposition of the conservation restriction stemmed from the change in the number of lots that could be sold, with the number and value of those lots (determined by the comparable-sales approach) being the principal points of disagreement. We had sufficient information from the experts that we were comfortable in evaluating and adjusting their analyses to produce valuations in which we had confidence. *See, e.g.*, *Symington v. Commissioner*, 87 T.C. at 903–904.

Certainly, we are not hostile to the income approach to determining value, and we have accepted (and applied) it in determining the value of conservation easements, *see, e.g.*, *id.* (subdivision method), although it is not favored if comparable-sales data are available, *see, e.g.*, *Chertkof v. Commissioner*, 72 T.C. 1113, 1122 (1979), *aff'd*, 649 F.2d 264 (4th Cir. 1981). As we said in *Whitehouse I*, 131 T.C. at 153: "The usefulness of the income approach diminishes * * * as the quality of the evidence of the income-producing potential of the property (usually evidence of its past performance)

diminishes. It has been judged an unsatisfactory valuation method for property that does not have a track record of earnings." *See Duncan Indus., Inc. v. Commissioner*, 73 T.C. 266, 280 n.13 (1979) (rejecting capitalization-of-income approach where corporation had just come into existence); *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 89 (1973) (rejecting capitalization-of-income approach where coal fields were not yet developed and operational on date for valuation), *aff'd without published opinion*, 500 F.2d 1400 (3d Cir. 1974); *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–244 (1968) (rejecting real estate valuation based on capitalization-of-income approach in favor of market value established by recent sales), *aff'd*, 406 F.2d 288 (2d Cir. 1969); *see also, e.g.*, *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1200 (7th Cir. 1992) ("[T]he law is clear in Wisconsin that when comparable-sales evidence is available, income evidence should not be admitted. * * * Income evidence is generally considered too speculative as it depends upon too many contingencies to be reliable for determining fair market value."); *Winooski Hydroelectric Co. v. Five Acres of Land*, 769 F.2d 79, 82 (2d Cir. 1985) ("On the most basic level, the future income calculations were too speculative, since Green Mountain had not operated any business at Montpelier #4 for over a decade."). The Court of Appeals has also approved a trial court's excluding income-generating proposals from the consideration of value where the evidence showed that the proposals were too speculative to contribute to market value. *United States v. Land, 62.50 Acres of Land More or Less*, 953 F.2d 886, 891, 893 (5th Cir. 1992).

What these cases establish is that the reliability of the income approach depends on the underlying facts (e.g., whether there is an ongoing business on the valuation date), the quality of the evidence, and whether evidence of comparable sales was available. We have explained our general hesitancy with respect to Mr. Roddewig's model on the basis of his failure to quantify the risk inherent in the conclusion he draws from it. Moreover, he did not capitalize the income of an ongoing business.[7] He identified the property that he was to value as the shell of the Maison Blanche Building,

---

[7] The Maison Blanche Building did have an income history on the valuation date; Mr. Roddewig disregarded that history in applying his model to value of the building.

and, for that property, comparable-sales data were available. We felt, and still do, that there is simply too much uncertainty and unquantified risk associated with Mr. Roddewig's application of the income approach for us to accept at face value his value conclusions resulting from that approach. We do not intend to write a rule for facade cases in general, nor do we rule out the income approach in some of those cases; we deal here only with the facts (testimony) before us.

One significant problem with respect to Mr. Roddewig's income approach that is specific to the facts before us is that a large portion of the change in annual operating costs that he projected is attributable to annual additions to a "facade replacement reserve" on the basis of an estimate of terra cotta replacement costs that we found to be unreliable. *Whitehouse I*, 131 T.C. at 150–151, 155. [8] We also faulted Mr. Roddewig for inadequately explaining, among other costs, an almost $3 million architect's fee, approximately $4 million for a development fee, interest, real estate taxes, "Etc.", a project management fee of approximately $2.6 million, and a financing fee of approximately $4.7 million. Finally, we had a major problem with his failure adequately to explain the change in his assumed capitalization and discount rates. *Id.* at 155. We pointed out that, if we reduce his 0.5% increase in both his capitalization and discount rates by 0.1% (a 20% reduction), the value he calculated for the servitude would be reduced by close to $1 million. *Id.*

### 3. *Conclusion*

To sum up, Mr. Roddewig used a computer model employing a discounted cashflow analysis to arrive at both before- and after-restriction present values for the Maison Blanche-Kress parcel (the difference being his estimate under the income approach of the value of the servitude). We have no difficulty with the process. Where we have difficulty is with petitioner's call to trust on their face Mr. Roddewig's judgments as to values to be input to his model. Certainly there are risks associated with those values, but we are not informed as to the magnitude of those risks, either individ-

---

[8] "Mr. Roddewig estimated the cost of replacing the facade to be $46,719,755, of which the cost of terra cotta would be $42,025,000." *Whitehouse I*, 131 T.C. at 155.

ually or in total. We have also described specific concerns that we have with certain of the values Mr. Roddewig input to his model. Together, we think those factors are sufficient that we need give no weight to his income approach in determining the value of the servitude.

Finally, there is the fact that, during the trial, petitioner asked us to take judicial notice of the pending bankruptcy of the partnership on July 25, 2003, the date the petition was filed. The bankruptcy proceeding commenced on January 3, 2002, and it was brought under chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Louisiana (case No. 02–10061). Petitioner referenced the bankruptcy in support of its claim that, pursuant to section 7491, the partnership lacked sufficient net worth such that petitioner was not excluded from shifting the burden of proof to respondent. *See* sec. 7491(a)(2)(C). And while subsequent events generally are not considered in fixing fair market value, they may be considered to the extent that they were reasonably foreseeable on the date as of which the value is fixed. *E.g.*, *Estate of Gifford v. Commissioner*, 88 T.C. 38, 52 (1987). Mr. Argote testified that, "based upon what * * * [he] knew in 1997 * * * [,] * * * development of the Ritz-Carlton was not feasible."[9] That opinion, he added, was borne out by the fact that full-service hotel projects that went ahead in the 1990s and up to the mid-2000s "have generally gone into bankruptcy". While we have no additional information concerning the partnership's bankruptcy, the risk inherent in the Maison Blanche development was, on the valuation date, apparent to Mr. Argote. The partnership's bankruptcy and Mr. Argote's testimony stand in sharp contrast to the rosy pictures generated by Mr. Roddewig's model, which showed a positive worth for the Maison Blanche-Kress parcel both before and after conveyance of the servitude (and a terminal value of over $100 million on the hypothetical sale of the parcel after conveyance of the servitude, in 2003). As

[9] More fully, he testified:

I had the opportunity in the early 1990's to do counseling with the Windsor Court Hotel. And I had been doing appraisals of multiple hotel operations in the * * * [Central Business District], in Vieux Carré, from the early 1990s through the 1997 date.

And based upon the costs that had been related to be—that would be incurred in the construction of the Ritz-Carlton, and the opportunity for them to lease the hotel out at a particular averaged daily rate, it was fairly easy to conclude that at that point in time, the project simply didn't make sense.

stated, we reject Mr. Roddewig's testimony valuing the Maison Blanche-Kress parcel under the income approach because we judge that testimony to be unreliable.

C. *Comparable-Sales Approach*

1. *Introduction*

In *Whitehouse I*, relying exclusively on the comparable-sales approach, we found the value of the servitude to be $1,792,301, calculated as follows:

*Value of the servitude under comparable-sales approach*

| | |
|---|---:|
| Before-restriction value ................................. | $12,092,301 |
| Less after-restriction value ........................... | 10,300,000 |
| Value of the servitude ................................... | 1,792,301 |

Putting aside for the moment the question of the effect of the servitude on the value of the Kress Building, we discern from petitioner's supplemental brief two principal concerns with our application of the comparable-sales approach; viz, that we rejected Mr. Roddewig's sales of nonlocal comparable properties and that we disregarded his determination of the value of the Maison Blanche-Kress parcel based on dollars paid per hotel guest room for comparable properties. The more important of those concerns is the first, because, if we are right on the first, the second is of no consequence to petitioner, since, considering only local sales, Mr. Roddewig's per-room analysis produces a lower value for the Maison Blanche Building than does his per-square-foot analysis. [10]

_____

[10] Mr. Roddewig reports a mean adjusted price per square foot of $53.44 for his local comparables and 530,646 square feet in the Maison Blanche-Kress parcel (not including the potential of any addition to the Kress Building), which indicates a before-restriction value, on a per-square-foot basis, of $28,357,722. He also reports a mean adjusted price per room of $31,263 for his local comparables and 720 planned rooms (without regard to any rooms to be built above the Kress Building), which indicates a before-restriction value, on a per-hotel-room basis, of $22,509,360. He adds that consideration should be given to the addition of 60 rooms to the Kress Building, which, keeping the price per room at $31,263 but changing the number of planned rooms to 780, indicates a before-restriction value, on a per-room basis, of $24,385,140. The per-square-foot analysis still produces a higher value for the Maison Blanche-Kress parcel.

## 2. *Disregard of Sales of Nonlocal Comparable Properties*

Mr. Roddewig testified that he included nonlocal comparables because none of the buildings that he found in downtown New Orleans were similar to the Maison Blanche-Kress parcel in size or luxury hotel market orientation. He added: "'Buildings purchased for rehabilitation into first class luxury hotels trade in a national marketplace, so it is appropriate to analyze sales in other cities for purposes of establishing the value of the Maison Blanche Hotel Complex by the Sales Comparison Approach.'" *Whitehouse I*, 131 T.C. at 157.

Mr. Argote saw no need for nonlocal comparables. While he agreed that, occasionally, if there are insufficient local sales, an appraiser has to look outside the location of the subject property for comparables, he thought there was an adequate number of local comparable properties. *Id.* And, indeed, Mr. Roddewig did identify five local sales of comparable properties; Mr. Argote believed that there were nine that Mr. Roddewig should have considered. *Id.* at 158.

We rejected Mr. Roddewig's nonlocal comparables for a number of reasons. First, we expressed our preference for local comparables, stating: "The reason is simply that location plays a huge role in determining the desirability, and, thus, the value of real estate. We reduce substantially the risk of error in employing the comparable-sales approach if, on account of proximity, we can eliminate (or reduce the significance of) location as a distinguishing factor." *Id.* at 157–158. The Court of Appeals has also recognized the link between proximity and probative value: "The more comparable a sale is in characteristics, *proximity*, and time, the more probative it is of value." *Estate of Jameson v. Commissioner*, 267 F.3d 366, 373 (5th Cir. 2001) (emphasis added), *vacating and remanding* T.C. Memo. 1999–43. We found the risk of relying on Mr. Roddewig's nonlocal comparables to be significant because the adjusted values he determined for his nonlocal properties were significantly higher than the adjusted values he determined for his local properties, "64 percent higher on a square footage basis and at least double on a per room basis". *Whitehouse I*, 131 T.C. at 158. Those large variances from the local real estate market underscore the lack of comparability of the nonlocal properties that Mr.

Roddewig chose. Moreover, there were at least five (in Mr. Roddewig's opinion) and as many as nine (in Mr. Argote's opinion) local sales of comparable properties for which the risk of proximity disparity was low, and the addition of Mr. Roddewig's nonlocal comparables would, by increasing the risk of proximity disparity, only decrease the probability of an accurate valuation of the Maison Blanche Building, unless some characteristic of those nonlocal sales sufficiently increased that probability. We did not believe that it did, adding:

Nor are we convinced that it was appropriate to take nonlocal sales into account because of his claim that buildings purchased for rehabilitation into first class luxury hotels trade in a national marketplace. He [Mr. Roddewig] had no statistics supporting that claim, nor did he have evidence of any competition for the Maison Blanche Building, which, 2 years before the valuation date, was purchased for the relatively moderate price of $6.625 million. [*Id.*; fn. ref. omitted.]

3. *Highest and Best Use*

Mr. Roddewig looked to nonlocal comparables, and he made price point adjustments for his comparables (adjusting for the higher room rates expected at a Ritz-Carlton Hotel), because he determined that the highest and best use of the Maison Blanche-Kress parcel before the conveyance was a mixed use development, including a Ritz-Carlton Hotel with 512 rooms (60 of them above the Kress Building), an additional all-suites hotel with approximately 268 rooms, and retail use on the first two floors and mezzanine of the Maison Blanche Building (for short, luxury hotel development). *Id.* at 130–131. Mr. Argote determined that the highest and best use of the Maison Blanche Building both before and after the conveyance was as a hotel (not necessarily a Ritz-Carlton Hotel) with retail space (for short, a nonluxury hotel development). *Id.*

The Court of Appeals found inadequate our findings with respect to highest and best use:

As stated, Whitehouse contends the highest and best use of the Maison Blanche and Kress buildings was as a Ritz-Carlton (per Roddewig's opinion), not as a non-luxury hotel (per Argote's opinion). The tax court did not explicitly rule on this issue, but it did not accept Roddewig's opinion on highest and best use. Accordingly, on this issue, the tax court's decision can be construed in two ways: even if the highest and best use was as a

Ritz-Carlton, that had no effect on the property's value; or, a non-luxury hotel was the highest and best use. * * * [*Whitehouse II*, 615 F.3d at 335–336.]

The Court of Appeals is correct that we did not explicitly decide whether the highest and best use of the Maison Blanche-Kress parcel was as a luxury hotel or as a nonluxury hotel. What we did decide was that Mr. Roddewig erred in his opinion that the highest and best use of the Maison Blanche-Kress parcel differed after the conveyance because the servitude prevented the partnership from adding stories to the Kress Building. *Whitehouse I*, 131 T.C. at 135. We address that conclusion *infra* in section III. of this report.

We of course agree with the Court of Appeals that finding a property's highest and best use is critical for determining its fair market value. *Whitehouse II*, 615 F.3d at 335 (citing *Olson v. United States*, 292 U.S. 246, 255 (1934)). Indeed, we have said: "The realistic, objective potential uses for property control the valuation thereof." *Stanley Works v. Commissioner*, 87 T.C. at 400. Nevertheless, we are not compelled to choose between Messrs. Roddewig's and Argote's competing opinions as to highest and best use of the Maison Blanche Building either as a luxury or as a nonluxury hotel. The term "highest and best use" may be defined as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." Appraisal Institute, The Appraisal of Real Estate 277–278 (13th ed. 2008). But, *and this is very important*, the highest and best use of property does not itself identify the fair market value of the property: It "forms the foundation for the opinion of value." *Id.* at 295. [11] As the Supreme Court explained, the determination of fair market value incorporates the highest and best use of a piece of property only if the demand for that use will affect the market price:

[M]arket value fairly determined * * * does not depend upon the uses to which * * * [the owner] has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or

---

[11] More extensively: "The highest and best use is shaped by the competitive forces within the market where the property is located and provides the foundation for a thorough investigation of the competitive position of the property in the minds of market participants." Appraisal Institute, The Appraisal of Real Estate 277 (13th ed. 2008).

likely to be needed in the reasonably near future is to be considered, *not necessarily as the measure of value*, but to the full extent that the prospect of demand for such use *affects the market value* * * * [*Olson*, 292 U.S. at 255; emphasis added.]

Accordingly, as the Court of Appeals has explained: "Even if * * * a potential use is profitable and * * * the property is adaptable for that use, that use is not necessarily the measure of the value of the property. Instead, it is to be considered to the extent the prospect of demand for the use affects market value." *Land, 62.50 Acres of Land More or Less*, 953 F.2d at 890 (citing *Olson*, 292 U.S. at 255); *see also Boltar, LLC v. Commissioner*, 136 T.C. 326, 336 (2011) ("The concept of 'highest and best use' is an element in the determination of fair market value, but it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for this indicated value.").

4. *Second-Best Use*

The point to be taken is that, although the highest and best use of property may determine a ceiling on how much a willing buyer would pay for the property, it does not necessarily determine a floor on how little a willing seller would accept. In other words, the hypothetical willing buyer and the hypothetical willing seller who populate our standard definition of fair market value[12] will not invariably conclude their negotiation over price at a price reflecting the value of the property at its highest and best use. In *Van Zelst v. Commissioner*, 100 F.3d 1259 (7th Cir. 1996), *aff'g* T.C. Memo. 1995–396, Judge Easterbrook, writing for the court, explained this commonsense point by reference to auction theory.[13] He rejected as "nonsense on its own terms" an appraisal, used to support a substantial charitable contribution deduction for the contribution to the United States of lands in the Alaskan wilderness, that was based on the theory that the property might be developed as a luxury resort lodge. *Id.* at 1262. He explained: "It should not have required the award of the 1996 Nobel Prize in Economics to

---

[12] "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A–1(c)(2), Income Tax Regs.

[13] We borrow here (and in other places) from the appellee's brief in this case before the Court of Appeals.

William Vickrey, a pioneer of auction theory, to remind people that the market price of an asset depends on the *second-most-productive* use to which it can be put." *Id.* (citing R. Preston McFee & John McMillan, "Auctions and Bidding", 25 J. Econ. Lit. 699 (1987)). He further explained that the equilibrium price at which the willing buyer and the willing seller would meet would be somewhere between the value of the property taking into account its most productive use (i.e., its highest and best use) and the value of the property taking into account its second most profitable use. *Id.* at 1262–1263. If there are many potential buyers in the market for the property, the equilibrium price would be closer to the price determined by taking into account its most productive use, and, if there are few potential buyers in the market for the property, it would be closer to the price determined by taking into account its second most productive use. *Id.* Judge Easterbrook's discussion of the value of land in Alaska— which, as here, the taxpayer claimed, could be used for the development of a luxury hotel—is helpful in resolving the problem before us; viz, the value of a property in New Orleans that might be used to develop a luxury hotel:

Suppose three parcels of private land in the Park are equally suitable to be the site of a resort that will bring its developer $2 million after costs of construction and operation. How much will the developer pay for the land? That depends on what else the owners can do with their land, as the developer will shop for the lowest price. Suppose Parcel A has a vein of ore with a present value of $650,000, and Parcels B and C, which lack minerals, are suitable only for subsistence hunting and fishing (value $10,000). The owner of Parcel A will not sell for less than $650,000, but the owners of Parcels B and C will sell for anything over $10,000. The developer will not pay $650,000 to the owner of Parcel A, when he can get land for so much less elsewhere, so Parcel A is worth only $650,000 as the value of its second-best-use, a mine. If there were no Parcel C, the developer and the owner of Parcel B would reach a deal in the range between $10,000 and $650,000: the developer never pays more than $650,000 (for he can turn to Parcel A), and the owner never takes less than $10,000 (for he can keep the land in its current use). When there is a Parcel C, a threat to buy it instead of Parcel B helps the developer chisel the price down, unless the owners collude. As the number of available sites rises, the possibility of collusion declines. When there are hundreds of potential sites (as there are in the Park and Preserve), the price the developer must pay falls to the competitive level. To put this otherwise, land is not a scarce resource in these mountains; financing and entrepreneurship are the scarce ingredients, so they will capture the economic return of resort development. Yet the Hawley Group's appraisal attributed to the Nelson

Mine 100 percent of the (potential) economic profit of a resort development. It did not offer a rationale for that allocation. At oral argument Van Zelst's lawyer tried to supply one by saying that the number of potential resort-mine combinations in the vicinity is small, but for reasons we have already explained even a "small" number of rivals allows the developer to capture the returns * * *. [*Van Zelst v. Commissioner*, 100 F.3d at 1262–1263.]

*See also Caracci v. Commissioner*, 456 F.3d 444, 459 (5th Cir. 2006) (citing with approval that discussion of comparable properties), *rev'g* 118 T.C. 379 (2002).

Even if Mr. Roddewig is right that the highest and best use of the Maison Blanche-Kress parcel before the conveyance to PRC was a luxury hotel development and that "[b]uildings purchased for rehabilitation into first class luxury hotels trade in a national marketplace", that does not necessarily lead to the conclusion that the fair market value of the parcel is much (if indeed any) greater than the price that would be predicted for the parcel taking into account its second best use; i.e., development as a nonluxury hotel. By his own admission, what Mr. Roddewig valued was the shell of a building, which he thought could profitably be developed into a hotel: "We have concluded that the highest and best use of the Maison Blanche Building * * * [before conveyance] is rehabilitation of the 'shell' structure for hotel use with retailing on the first and second floor[s]". He identified as comparables five local buildings which he described as "downtown New Orleans buildings purchased as shells for adaptive reuse as hotels." He cautioned, however, that "none were similar to the Maison Blanche hotel complex in size and luxury hotel market orientation." The size dissimilarity is easily adjusted for. The second dissimilarity appears inappropriate, however, since, admittedly, he was comparing building shells, and, for the shell of a building, similarity is determined by development potential, not by actual development. To reflect an *after-development* dissimilarity between the Maison Blanche-Kress parcel and the comparables, he made his so-called hotel price point adjustments, whereby he adjusted (upward) the reported sale price of each comparable building to reflect the higher room rates expected at a Ritz-Carlton Hotel over the *actual* rates quoted for rooms at the comparable buildings, *after* their development into hotels. While apparently none of the comparables was developed into a luxury hotel, petitioner makes no argument that, when

considered in their shell-state condition, luxury hotel development was precluded for any of the comparables. The hotel price point adjustments therefore are beside the point. So long as the comparables when considered as shell buildings had a potential for hotel development (luxury or not) similar to that of the Maison Blanche Building when considered as a shell building, the comparables' actual development as nonluxury hotels is irrelevant. Petitioner wants to ascribe to the shell of the Maison Blanche Building some difference ("luxury hotel market orientation") that it has not shown exists. Luxury versus nonluxury might be a relevant distinction when applying the comparable-sales approach to valuing renovated properties (or when applying the income approach to valuing improved or unimproved real property), but even in those circumstances there is a hotel business whose value must be differentiated from the value of the real property.

Moreover, petitioner has failed to show that, on the valuation date, there was any scarcity of buildings in New Orleans suitable for development as luxury hotels. Only if there were sufficient scarcity would the partnership, considering it as the landlord of the Maison Blanche Building, capture a piece of the economic return to luxury hotel development of the building's shell. But, as Judge Easterbrook points out, even a small number of rivals allows the developer (and not the property owner) to capture the return. *Van Zelst v. Commissioner*, 100 F.3d at 1263. Mr. Roddewig identified five local comparables, while Mr. Argote believed that there were nine. Local rivals, therefore, were not scarce, and, as to the intensity of demand, Mr. Roddewig had no "evidence of any competition for the Maison Blanche Building, which, 2 years before the valuation date, was purchased for the relatively moderate price of $6.625 million." *Whitehouse I*, 131 T.C. at 158. Since it was petitioner's burden to establish otherwise, and since petitioner did not do so, we assume that, on the valuation date, demand also was weak.

Finally, Mr. Roddewig did not justify his use of nonlocal comparables and his price point adjustments on competitive grounds (i.e., that, on the valuation date, it was a seller's market for properties comparable to the Maison Blanche Building) but on the ground that buyers in the marketplace

for shell buildings suitable for development into luxury hotels "will pay a premium without trying to think about what the local buyers will pay." *Whitehouse I*, 131 T.C. at 160. Even in the absence of competing bids, that is, he testified that developers of luxury hotels will leave money on the table by paying more than the local market would demand for the property. *Id.* Put simply, that defies common sense. Moreover, it contradicts a basic tenet of the fair market value paradigm; viz, that, with respect to both the hypothetical buyer and the hypothetical seller, "each is a rational economic actor, that is, each seeks to maximize his advantage in the context of the market that exists at the date of valuation." *Estate of Jameson v. Commissioner*, 267 F.3d at 370; *see also Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217–218 (1990). The rational economic buyer's advantage is that the sellers' properties are worth more to him than they are to the sellers, and he maximizes that advantage by acquiring a seller's property at the lowest cost that seller will accept. [14]

5. *Conclusion*

The highest and best use of the Maison Blanche-Kress parcel on the valuation date may have been luxury hotel development; but even if we were to accept that as a fact, it does not rule out the possibility that the *value* of the parcel on that date was dictated by its second best use (which, we assume, is as a nonluxury hotel). We have Mr. Roddewig's testimony that, on the valuation date, the market for the parcel was national and that luxury hotel developers have deep pockets and do not stoop to bargain, but we have rejected that. While the fair market value of the parcel may have fallen somewhere between its value determined by its highest and best use and its value determined by its second best use, we have no evidence, or the tools, to determine what that might be. In *Whitehouse I*, 131 T.C. at 158–160, we disregarded Mr. Roddewig's nonlocal comparables and his price point adjustments, and we determined the value of the

---

[14] That the partnership itself might have been unwilling to sell the Maison Blanche Building shell for less than a price reflecting its highest and best use is beside the point, for the definition of fair market value assumes a hypothetical seller as well as a hypothetical buyer. *Caracci v. Commissioner*, 456 F.3d 444, 456 (5th Cir. 2006), *rev'g* 118 T.C. 379 (2002); sec. 1.170A–1(c)(2), Income Tax Regs.

Maison Blanche Building on the basis of only local comparables, without any price point adjustments. We continue to believe that that was the proper course. In effect, then, we are accepting Mr. Argote's methodology and his view that the value of the subject property under the comparable-sales approach is to be determined on the basis of sales of buildings suitable for conversion into hotels—luxury or not. The properties that both expert witnesses chose represent the market value of shell buildings of comparable age, character, and quality that were suitable for conversion to hotels. They are, therefore, representative of how the market would have valued the Maison Blanche Building at the time of the donation. We do not need to choose between the two experts' opinions of highest and best use, since, even if we were to agree with Mr. Roddewig, it would make no difference. [15]

## III. *Effect of the Servitude*

### A. *Introduction*

We have summarized the terms of the conveyance above and have set it out in full (excluding exhibits) in the

---

[15] Mr. Roddewig also believed that the highest and best use of the Maison Blanche-Kress parcel would involve the addition of 60 rooms above the Kress Building. Since we reject his reproduction cost and income approaches to valuing the servitude for reasons not directly implicating the addition of those 60 rooms, we do not consider in connection with those approaches whether the parcel's highest and best use involved that addition. Nor for the reason set forth *supra* note 10 do we need to consider it in connection with the comparable-sales approach. In any event, petitioner has failed to convince us that a nine-story, 60-room addition above the Kress Building would have been the highest and best use of the property. All we have is Mr. Roddewig's "analysis", made in conjunction with the architects, "indicat[ing] that up to nine additional floors could be built atop the Kress Building." Petitioner has not translated that unquantified possibility into a quantified probability. There is more to determining whether something is practicable than determining that it is possible. *See, e.g.*, *Olson v. United States*, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned * * * in judicial ascertainment of truth."). Petitioner has failed to provide convincing evidence that an addition atop the Kress Building as part of the development of the Maison Blanche-Kress parcel was part of the highest and best use of the parcel. It is Mr. Roddewig's *conjecture*, based upon anecdotal information, that the City would have permitted the floor area ratio to increase even more than the City had already specially excepted. Even if the City had approved additional density, the record contains only rough architectural drawings. Beyond that there is nothing that shows this nine-story addition would have been physically possible, or that it would not have been cost prohibitive. Or, indeed, that Ritz-Carlton would have welcomed such an addition. The partnership and Ritz-Carlton agreed in a Pre-Commencement Agreement to construct and operate a 437-room hotel. We do not know whether Ritz-Carlton would have approved the additional rooms considering that they would have been restricted to light wells.

appendix. The six-story Kress Building is adjacent to the Maison Blanche Building on Canal Street. According to petitioner, in order to protect that portion of a common wall rising above the Kress Building, the conveyance prevents the partnership "from building additional stories atop the Kress Building and from selling the Kress Building unencumbered." In *Whitehouse I*, 131 T.C. at 132, we began our discussion of the conveyance by noting that petitioner described the partnership's risk from building above the Kress Building or selling the Kress Building "unencumbered" as the risk of being sued by PRC for breach of contract. Petitioner conceded that no portion of the protected facade is actually located on the Kress Building. Moreover, neither the definition of "improvement" nor the definition of "property" in the conveyance includes the Kress Building. *Id.* We found that the conveyance creates no charge on (i.e., does not burden) the Kress Building, *id.* at 134, and the Court of Appeals agreed with us that the conveyance does not burden the Kress Building, *Whitehouse II*, 615 F.3d at 337. We continued:

Petitioner has therefore failed to prove that, by the conveyance, and pursuant to La. Rev. Stat. Ann. sec. 9:1252 (1991), the partnership granted PRC a perpetual real right (servitude) of any extent in the Kress Building. *While the partnership may have obligated itself personally to maintain a view of the Maison Blanche Building, petitioner has failed to show how that promise binds anyone who does not undertake it * * ** [*Whitehouse I*, 131 T.C. at 134–135; emphasis added.]

Implicit in the emphasized language is our conclusion that, not only did the servitude not burden the Kress Building, but it did not impose any obligation on the partnership not to build atop it so as to block views of the Maison Blanche Building's facade. That is not to say that the partnership had not personally obligated itself not to do so, but we did not read the servitude to include that obligation. And that is an important distinction. All agree that the servitude constitutes a perpetual conservation restriction.[16] The Louisiana statute

---

[16] While sec. 170(a) allows a deduction for any charitable contribution, sec. 170(f) denies a charitable contribution deduction for certain contributions of partial interests in property unless, among other exceptions, the contribution of the partial interest is a qualified conservation contribution. Sec. 170(f)(3)(B)(iii). "A qualified conservation contribution is the contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes." Sec. 1.170A–14(a), Income Tax Regs. "A 'perpetual conservation restriction' is a qualified real property interest." Sec. 1.170A–14(b)(2), Income Tax Regs. "A 'perpetual conservation re-

pursuant to which the servitude was created, La. Rev. Stat. Ann. sec. 9:1252, specifies that a real right created pursuant to the section "shall be effective against third parties when filed for registry in the conveyance records of the parish in which the immovable property is located." La. Rev. Stat. Ann. sec. 9:1252, C. That, the pertinent regulations recognize, is sufficient to conclude that the servitude is enforceable in perpetuity:

In the case of any donation under this section, any interest in the property retained by the donor (and the donor's successors in interest) must be subject to legally enforceable restrictions (for example, by recordation in the land records of the jurisdiction in which the property is located) that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation. * * * [Sec. 1.170A–14(g)(1), Income Tax Regs. (general rule under heading "*Enforceable in perpetuity*").]

Thus, if the partnership's supposed obligation with respect to the Kress Building is not within the burdens or obligations constituting the servitude, [17] then, unless petitioner can otherwise show us that the obligation is enforceable in perpetuity, [18] it fails as a perpetual conservation restriction, and it cannot be taken into account in determining the amount of the partnership's charitable contribution deduction on account of its December 29, 1997, conveyance of certain rights in the Maison Blanche Building to PRC. That is not to say, of course, that the burden of the supposed obligation, which has no apparent enforceability against successors in ownership to the building, did not reduce the value of the contiguous Maison Blanche and Kress Buildings; but unless the obligation is, or constitutes part of, a perpetual conservation restriction, that reduction in value cannot be counted as part of qualified conservation contribution. *See* sec. 1.170A–14(h)(3), Income Tax Regs. Because petitioner failed to show us that the partnership's supposed obligation not to build atop the Kress Building is enforceable against any successor in interest, we concluded in *Whitehouse I* that the supposed obligation, if enforceable, is not enforceable in perpetuity. *See*

---

striction' is a restriction granted in perpetuity on the use which may be made of real property—including, an easement or other interest in real property that under state law has attributes similar to an easement (e.g., a restrictive covenant or equitable servitude)." *Id.*

[17] The real right established pursuant to La. Rev. Stat. Ann. sec. 9:1252 may not only burden property, but it "may additionally obligate the owner of the * * * property as is necessary to fully execute the rights granted herein." La. Rev. Stat. Ann. sec. 9:1252, A.

[18] Petitioner has not done so.

sec. 1.170A–14(g)(1), Income Tax Regs. Therefore, we disregarded it in determining the value of the servitude and, consequently, the amount of the partnership's charitable contribution deduction.

We are aware that, in *Whitehouse II*, 615 F.3d at 337, the Court of Appeals stated: "[B]ecause of the easement, Whitehouse could not build on top of the Kress building". We are also mindful that, once a case has been decided on appeal and a mandate issued, a lower court is not free to alter the mandate of the appellate court, although it is free to decide matters that are left open by the mandate. *Barrett v. Thomas*, 809 F.2d 1151, 1154 (5th Cir. 1987) (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). Because the distinction we have drawn between the partnership's personal obligation not to block views of the Maison Blanche Building and its burdens and obligations undertaken pursuant to the real right created by the servitude was not considered by the Court of Appeals, we see some daylight to again examine the conveyance to see whether it imposes an obligation on the partnership not to block views of the Maison Blanche Building. We believe that type of analysis is what the Court of Appeals intended when it directed this Court to reconsider the effect of the servitude on the fair market value. *Whitehouse II*, 615 F.3d at 340. If we overstep our authority, we apologize. We shall recalculate the value of the servitude on the assumptions that, in fact, it does obligate the partnership not to build atop the Kress Building and that separate ownership of the Maison Blanche and Kress Buildings is unlikely.

### B. *The Conveyance*

### 1. *Introduction*

We look to Louisiana law in interpreting the conveyance. *Id.* at 329 (citing *Adams v. United States*, 218 F.3d 383, 386 (5th Cir. 2000) ("To arrive at a reasonable conclusion regarding the value of the property at issue * * *, one must first determine the rights afforded to the owner of such property by the applicable state law.")). By its terms, and pursuant to La. Rev. Stat. Ann. sec. 9:1252, the conveyance purports to transfer a perpetual real right "in and to certain exterior surfaces of the * * * [Maison Blanche Building]" to

PRC. La. Rev. Stat. Ann. sec. 9:1252, A. provides for the creation of a perpetual real right burdening the whole or any part of immovable property, including its facade, in favor of an entity formed exclusively for certain public purposes. While the provision is found in the statute among provisions headed "Predial Servitudes" (La. Rev. Stat. Ann. title 9, code book II, code title IV), the perpetual real right created by the provision has aspects of a right of use, a form of personal servitude. *See Whitehouse I*, 131 T.C. at 132–133. Petitioner argues that, in enacting La. Rev. Stat. Ann. sec. 9:1252, the legislature intended to create a special type of predial servitude, one that has characteristics of both predial and personal servitudes. As we discussed in *Whitehouse I*, 131 T.C. at 133–134, whether most resembling a right of use or a predial servitude, the perpetual real right created by the provision is subject to the interpretive rules applicable to predial servitudes. Thus, for instance: "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." La. Civ. Code Ann. art. 730 (2008). "[T]he proper interpretation of an ambiguous instrument is that which least restricts the ownership of the land". *Id.* cmt. b. (Revision Comments—1977) (noting that Louisiana courts have applied this rule "in a variety of contexts"). One illustrative case cited in the comment is *Whitehall Oil Co. v. Heard*, 197 So. 2d 672 (La. Ct. App. 1967). There, the court was faced with construing a partition agreement to determine whether it created separate servitudes over each of several contiguous tracts or whether it created a single servitude over all of them. *Id.* at 676. The court stated that the answer depended on the intent of the parties to the agreement determined under principles of contract construction. *Id.* The court apparently found no role for parol evidence, stating: "[T]his determinative question is to be decided by the intention of the parties as reflected by the partition agreement." *Id.*; *see also Robert Inv. Co., Inc. v. Eastbank, Inc.*, 496 So. 2d 465, 472 (La. Ct. App. 1986) ("Parol evidence is not admissible to modify a written instrument pertaining to the establishment of a predial servitude.").

With these rules in mind, we approach the conveyance.

2. *Parties' Arguments*

Because language prohibiting the partnership from building atop the Kress Building is not apparent to us, we asked the parties to identify language in the conveyance either prohibiting the owner of the Maison Blanche Building from building atop the Kress Building or otherwise obscuring a view of the Maison Blanche Building. Respondent could identify no such language. Petitioner did not directly answer our request. [19] Rather, petitioner first references language in the first numbered paragraph of the conveyance identifying a portion of the facade:

exterior walls of the Lower Stories which are visible from Canal and Dauphine Streets, the exterior portion of the Improvement above the Lower Stories which is not covered by the Upper Stories, the exterior walls of the Upper Stories which are visible from Canal, Burgundy, Iberville, and Dauphine Streets[.] * * *

Petitioner then references the eleventh "whereas" clause in the preamble of the conveyance, in which the partnership states its "desire[ ] to donate, grant, transfer and convey to * * * [PRC] * * * a scenic, open space and architectural facade servitude". Conflating those two provisions, petitioner argues that the combined language "creates a servitude of view." Petitioner then refers us to La. Civ. Code Ann. art. 701, *Servitude of view* (2008), which provides: "The servitude of view is the right by which the owner of the dominant estate enjoys a view; this includes the right to prevent the raising of constructions on the servient estate that would obstruct the view."

3. *Discussion*

Petitioner's reliance on the preamble of the conveyance is misplaced. "Generally, a preamble does not create rights beyond those conveyed by the contract's operative terms." *Chevron U.S.A., Inc. v. Santa Fe Snyder Corp.*, 69 Fed. Appx. 658 (5th Cir. 2003) (citing *Grynberg v. FERC*, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to

---

[19] Although, in the introduction to its supplemental brief, petitioner assures us that it has responded "to each and every one of the matters as to which * * * [the] Court has requested supplemental briefing."

interpretation, 'cannot create any right beyond those arising from the operative terms of the document.'")); *see also Succession of Ramp*, 212 So. 2d 419, 423 (La. 1968). We shall, therefore, first set aside the portion of the preamble that petitioner relies on and consider the operative terms of the conveyance.

The conveyance (set out in the appendix) establishes in PRC a real right (i.e., the servitude) "in and to certain exterior surfaces of the Improvement [i.e., the improvement being the Maison Blanche Building and referenced exterior surfaces constituting the building's facade]". In furtherance of the servitude, the partnership agrees "to do (and refrain from doing)" each of certain listed things. The first paragraph following that prefatory language describes the facade and, as highlighted, is the object of petitioner's claimed servitude of view:

1. The exterior surfaces of the Improvement subject to this Servitude are *the exterior walls of the Lower Stories which are visible from Canal and Dauphine Streets, the exterior portion of the Improvement above the Lower Stories which is not covered by the Upper Stories, the exterior walls of the Upper Stories which are visible from Canal, Burgundy, Iberville, and Dauphine Streets*, and the roof of the Upper Stories * * * (the "Facade"). In the event of uncertainty, the exterior surfaces of the Improvement visible in the photographs in Exhibit C shall control.

Other operative provisions of the conveyance referenced by petitioner in passing that may be relevant to establishing the partnership's claimed duty not to build atop the Kress Building are as follows:

2. Donee acknowledges that Owner has provided to Donee Plans dated August 7, 1997, (the "Plans") pursuant to which Owner intends to renovate the Improvement, including the Facade, and that such renovation and rehabilitation have been approved by Donee, provided such work is in compliance with the Plans. * * * Owner further acknowledges and agrees that in the event any changes or modifications are made to the Plans which affect the Facade, Owner shall first obtain the prior written approval of Donee before any such changes or modifications are made.

3. Owner agrees at all times to preserve and maintain the Facade in a good and sound state of repair.

4. Without the express written permission of the Donee, its successors or assigns, signed by a duly authorized representative thereof, based upon written plans submitted by Owner to Donee, no construction, change, alteration, remodeling, renovation, or any other thing shall be undertaken by Owner or permitted to be undertaken in or to the Facade, which would

affect either the height, or alter the exterior of the Facade or the appearance of the Facade, other than as shown on the Plans * * *

The three paragraphs address the partnership's then-existing plans to renovate the Maison Blanche Building, its obligation to preserve and maintain the facade, and its rights to alter the facade. Nowhere in these three paragraphs is there any specific prohibition on building atop the Kress Building. The first of the three paragraphs addresses the partnership's plans (plans) to renovate "the Improvement", which, it must be remembered, is a defined term encompassing only the Maison Blanche Building (and not the Kress Building). Indeed, the partnership had not as of the date of the plans (August 7, 1997) acquired the Kress Building; and, while the Kress Building is shown on some sheets of the plans, it is labeled "Future Donation" and "To Be Acquired at a Later Date". The paragraph requires the partnership to secure PRC's approval if the partnership wished to change or modify the plans; but, since the plans involved only renovation of the Maison Blanche Building, the requirement in the paragraph to obtain approval for a change in plans would have no consequence for any plan by the partnership with respect to the Kress Building.

The second of the three paragraphs, whereby the partnership agrees to preserve and maintain the facade, does not bar the partnership from building atop the Kress building.

The third of the three paragraphs, establishing generally PRC's right to approve changes to the facade, is the most likely paragraph in which to look for such restrictions. The paragraph does condition a broad range of activities on obtaining PRC's written permission; viz, "construction, change, alteration, remodeling, renovation, or any other thing". But PRC's written permission must be obtained for any such activity only if (1) the activity is undertaken "in or to" the facade and (2) as pertinent, the activity would affect the height of the facade or alter either its exterior or appearance. And while it might be argued that constructing additional stories atop the Kress Building could change (block) the appearance of the facade to a person looking up at the facade from the street in front of, or on the side of, the heightened Kress Building, such construction would not in

normal speech be "in or to" the facade and, thus, would not require permission from PRC.

We do not find in the operative terms of the conveyance any prohibition restricting the partnership from building atop the Kress Building. Put another way, the operative terms of the conveyance do not convey to PRC a real right enforceable through a judicial proceeding by an action for injunction or damages if the partnership or any successor in interest were to build atop the Kress Building. *See* La. Rev. Stat. Ann. sec. 9:1252, C.

While we do not believe that the operative terms of the conveyance are in need of interpretation, we shall for the sake of argument assume that they are in such need and consider them in the light of the portion of the preamble to the conveyance identified by petitioner, which states the partnership's desire to grant to PRC "a scenic, open space" servitude as a perpetual real right. On the basis of that language, petitioner would have us find a servitude of view, which the Louisiana Civil Code describes as "the right by which the owner of the dominant estate enjoys a view; this includes the right to prevent the raising of constructions on the servient estate that would obstruct the view." La. Civ. Code Ann. art. 701 (2008).

A servitude of view, thus defined, is a rough fit, since, while the Maison Blanche Building and the land thereunder may conveniently be considered a servient estate, there is no dominant estate. A real right created pursuant to La. Rev. Stat. Ann. sec. 9:1252 does not run in favor of another estate but, rather, it runs in favor of an organization (here PRC). Nevertheless, since the Louisiana legislature classified the real right as a special type of predial servitude, we assume that, to the extent compatible, rules relating to servitudes of view, a type of predial servitude, would apply to any similar real right created pursuant to La. Rev. Stat. Ann. sec. 9:1252. *See* La. Civ. Code Ann. art. 645 (2010); *Whitehouse I*, 131 T.C. at 133.

A predial servitude is established by title; i.e., by juridical act. *See* La. Civ. Code Ann. art. 708 (2008). The Supreme Court of Louisiana has stated: "For a servitude to be created by title, the instrument must be express as to the nature and extent of the servitude." *Palomeque v. Prudhomme*, 664 So. 2d 88, 93 (1995). The court cautioned: "Because servitudes

are so disfavored, an ambiguous agreement to establish a servitude is unenforceable." *Id.* at 93–94. The court explained the reason for disfavoring predial servitudes: "Predial servitudes are in derogation of public policy because they form restraints on the free disposal and use of property." *Id.* at 93. It added: "Therefore, servitudes are not entitled to be viewed with favor by the law *and can never be sustained by implication*." *Id.* (emphasis added).

The operative terms of the conveyance do not establish a servitude of view. If the preamble of the conveyance is to be considered an interpretive aid in understanding that the operative terms of the conveyance do indeed establish a servitude of view, it must be that the preamble does so by implication, since neither the term "servitude of view" nor any description of a servitude of view appears in the preamble. To accept that a servitude of view (a predial servitude) is established by implication, however, is prohibited. *See Palomeque*, 664 So. 2d at 93–94. The Louisiana Civil Code provides to similar effect: "Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate." La. Civ. Code Ann. art. 730.[20] And while because of expected income tax advantage the partnership might not complain about an implied servitude of view prohibiting it from building on neighboring property, we have no assurance that a successor owner of the Maison Blanche Building (whether united with the Kress Building or not) would be as agreeable.

The Louisiana Civil Code has provided specifically for a servitude of view for many years. *See* La. Civ. Code Ann. art.

---

[20] In *Whitehouse I*, 131 T.C. at 133–134, we set forth cmt. (b) accompanying La. Civ. Code Ann. art. 730 (2008) (Revision Comments—1977). For convenience, we reproduce it here:

(b) It is a cardinal rule of interpretation that, in case of doubt, instruments purporting to establish predial servitudes are always interpreted in favor of the owner of the property to be affected. The rule incorporates into Louisiana law the civilian principle that any doubt as to the free use of immovable property must be resolved *in favorem libertatis*. * * * The Louisiana Supreme Court has repeatedly declared that "servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law." *Parish v. Municipality No. 2*, 8 La. Ann. 145, 147 (1853), cited with approval in *Buras Ice Factory, Inc. v. Department of Highways*, 235 La. 158, 103 So. 2d 74 (1958). See also *McGuffy v. Weil*, 240 La. 758, 767, 125 So. 2d 154, 158 (1960): "any doubt as to the interpretation of a servitude encumbering property must be resolved in favor of the property owner". The rule that the proper interpretation of an ambiguous instrument is that which least restricts the ownership of the land has been applied by Louisiana courts in a variety of contexts. See, e.g., *Whitehall Oil Co. v. Heard*, 197 So. 2d 672 (La. App. 3rd Cir.), writ refused 250 La. 924, 199 So. 2d 923 (1967) (determination of the question whether a landowner created a single servitude over contiguous tracts or a series of multiple interests). * * *

701 (source: 1977 La. Acts, No. 514, sec. 1, eff. Jan. 1, 1978 (reproducing Art. 716 of the La. Civ. Code of 1870)). If the drafters of the conveyance had by its terms intended it to restrict the partnership and any successor-owner of the Maison Blanche Building from building stories above the Kress Building or from otherwise blocking views of it, no doubt they would, in clear terms, have done so. They did not. No one coming across the conveyance in the conveyance records of the parish of Orleans could determine from its terms that they were prohibited (if they owned the Maison Blanche Building) from building atop the Kress Building or, say, from putting up a billboard across the street from the Maison Blanche Building but in direct line of sight of its facade from some location further away.

C. *Conclusion*

The conveyance does not create in PRC a real right enforceable against the partnership or any successor owner of the Maison Blanche Building to enjoin (or seek damages from) any such owner building atop the Kress Building or otherwise blocking views of the facade.

IV. *Valuation of the Servitude*

Notwithstanding our conclusion about the terms of the conveyance, we shall, consistent with the instruction of the Court of Appeals, reconsider the value of the servitude on the assumptions that, while it does not burden the Kress Building, it restricts the partnership from building atop it and that separate ownership of the Maison Blanche and Kress Buildings is unlikely (thus, in effect, making that restriction perpetual).

We have reconsidered the applicability of the reproduction cost and income approaches for valuing this servitude and, again, finding them unreliable, have rejected both methods. We have found the comparable-sales approach to be a reliable method of valuation, and we shall again apply it.

Mr. Roddewig testified that the area of the Kress Building is 16,210 square feet. We accept that measurement. When that area is added to the 514,566 square feet of area of the Maison Blanche Building, the area of the Maison Blanche-Kress parcel is 530,776 square feet. We acknowledged in

*Whitehouse I* that both experts agreed that larger properties tend to sell for less per square foot. We accordingly adjusted the comparable-sale prices for size in *Whitehouse I*. The addition of the Kress Building does not warrant any further adjustment for size.

Neither party asserts that in *Whitehouse I* we made erroneous adjustments to the four comparable-sale prices we relied on to reach a price per square foot of $23.50 before imposition of the servitude. We apply that value to the 530,776-square-foot area of the combined buildings. Applying the price per square foot of $23.50 to the area results in a total before-restriction value of $12,473,236, which we find is the before-restriction value of the Maison Blanche-Kress parcel.

In *Whitehouse I*, we accepted Mr. Argote's valuation of the after-restriction value of the Maison Blanche Building of $10.3 million. His valuation was based on comparable sales with an average price per square foot of $20. Applying the $20-per-square-foot price to the 530,776-square-foot area of the combined property results in a total after-restriction value of $10,615,520, which we find is the after-restriction value of the Maison Blanche-Kress parcel.

On the basis of our findings as to the before- and after-restriction values of the combined Maison Blanche and Kress Building property, we find that the value of the servitude on the valuation date was $1,857,716, calculated as follows:

*Value of the servitude under comparable-sales approach*

| | |
|---|---|
| Before-restriction value ................................. | $12,473,236 |
| Less after-restriction value ........................... | 10,615,520 |
| Value of the servitude ................................... | 1,857,716 |

## V. *Valuation Misstatement Penalty*

### A. *Introduction*

In *Whitehouse I*, we explained that section 6662(a) imposes an accuracy-related penalty in the amount of 20% of the portion of any underpayment of tax required to be shown on a return in the case of, among other things, any substantial

valuation misstatement. *See* sec. 6662(b)(3). Section 6662(h) increases the penalty to 40% in the case of a gross valuation misstatement. There is a substantial valuation misstatement if the value of any property claimed on the return is 200% or more of the amount determined to be the correct amount. Sec. 6662(e)(1)(A). There is a gross valuation misstatement if the value is 400% or more of the value determined to be the correct amount. Sec. 6662(h)(2)(A)(i). On the 1997 Form 1065, the partnership claimed a $7.445 million charitable contribution deduction for the fair market value of the servitude conveyed to PRC. The actual fair market value of the servitude, as we determine *supra*, was $1,857,716. Therefore, the partnership claimed a value that was approximately 401% of the actual value. Nevertheless, petitioner argues that the penalty should not be imposed, under the reasonable cause exception found in section 6664(c).

Generally, the section 6662 accuracy-related penalty will not be imposed with respect to any portion of an underpayment if the taxpayer can show that there was reasonable cause for that portion and that he acted with good faith with respect to that portion. Sec. 6664(c)(1); *see Stanford v. Commissioner*, 152 F.3d 450 (5th Cir. 1998), *aff'g in part and vacating in part* 108 T.C. 344 (1997). Under the regulations, "the most important factor" in determining whether the taxpayer had reasonable cause for his tax treatment and whether he acted in good faith "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664–4(b)(1), Income Tax Regs.; *see also Stanford v. Commissioner*, 152 F.3d at 460; sec. 1.6662–4(g)(4)(i), Income Tax Regs.

In the case of a substantial or gross valuation misstatement with respect to charitable deduction property, however, the reasonable-cause-and-good-faith exception does not apply unless the taxpayer can show that (1) "the claimed value of the property was based on a qualified appraisal made by a qualified appraiser", sec. 6664(c)(2)(A); and (2) "in addition to obtaining such appraisal, the taxpayer made a good-faith investigation of the value of the contributed property", sec. 6664(c)(2)(B). The pertinent regulations, section

1.6664–4(g)(1), Income Tax Regs. (1977), [21] make clear that the qualified-appraisal and good-faith-investigation requirements imposed by section 6664(c)(2) "apply in addition to the generally applicable rules concerning reasonable cause and good faith". [22] Although neither the statute nor the regulations clarify the relationship between the section 6664(c)(1) good faith requirement and the section 6664(c)(2)(B) good-faith-investigation requirement, it is clear that, with respect to any valuation misstatement of charitable deduction property, a taxpayer must act in good faith generally. While respondent concedes that the partnership satisfied the qualified-appraisal requirement, he argues that petitioner failed to show that, in addition, the partnership made a good-faith investigation of the value of the servitude.

B. *Discussion*

1. *Testimony of Mr. Drawbridge*

Petitioner relies principally on the testimony of Robert Drawbridge, the asset manager for the partnership, to show that the section 6662 accuracy-related penalty does not apply because the partnership qualifies for the section 6664(c) reasonable cause exception.

Mr. Drawbridge became asset manager for the partnership sometime in 2000, well after the 1997 Form 1065 was filed. He did not testify as to any personal knowledge of the operations of the partnership before his arrival, nor did he iden-

---

[21] Today in sec. 1.6664–4(h)(3), Income Tax Regs.

[22] This point was made, before promulgation of sec. 1.6664–4(g)(1), Income Tax Regs. (1997), by the Court of Appeals for the First Circuit in *McMurray v. Commissioner*, 985 F.2d 36, 43–44 (1st Cir. 1993), *aff'g in part, rev'g in part* T.C. Memo. 1992–27. In *McMurray*, the court addressed a precursor of sec. 6664(c)(2); viz, sec. 6659(f)(2), as added by the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98–369, sec. 155(c)(1), 98 Stat. at 693. The court held that the qualified-appraisal and good-faith-investigation requirements in sec. 6659(f)(2) (as added by DEFRA) were in addition to the reasonable basis and good faith requirements found in then sec. 6659(e):

The McMurrays seek relief under section 6659(e), which allows for a waiver of "all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith." While we have already concluded that the McMurrays acted in reasonable reliance on the Donovan appraisal, the inquiry does not end there, because section 6659(f)(2) prohibits a penalty waiver unless "the claimed value of the property was based on a qualified appraisal made by a qualified appraiser," *and*, "in addition to obtaining such an appraisal, the taxpayer made a good faith investigation of the value of the contributed property." On appeal, the McMurrays do not address section 6659(f)(2), nor does our review of the record indicate any additional investigation by the McMurrays into the value of the property. Thus, we affirm the imposition of penalties under section 6659.

tify anyone who informed him about partnership operations before that time. He testified that, in preparation for his testimony, he did review the books and records the partnership maintained in the ordinary course of its business. He testified that, in filing the 1997 Form 1065, the partnership relied on an appraisal made by M. Richard Cohen (Cohen appraisal) for the value of the donation. He testified that, to the best of his knowledge, the partnership reviewed and relied on a second appraisal, dated January 1, 1998, obtained by the then limited partner of the partnership from Revac, Inc., of Houston, Texas (Revac appraisal). (The Revac appraisal, among other things, estimates the market value of the Maison Blanche Building (1) before rehabilitation, (2) just after rehabilitation, and (3) upon achieving stabilized occupancy.) He testified that Reznick, Fedder & Silverman (Reznick firm) prepared the 1997 Form 1065 and provided tax advice to the partnership with respect to its tax-reporting positions. He testified that, in filing the 1997 Form 1065, the partnership relied on the professional tax advice it received from the Reznick firm and from the Elkins law firm (Elkins firm). He testified that a PRC representative signed the Form 8283, Noncash Charitable Contributions, attached to the 1997 Form 1065, acknowledging receipt of the servitude.

In *Whitehouse I*, 131 T.C. at 174, we stated: "The 1997 Form 1065 was signed on October 14, 1998, and the question before us is whether, before it was signed, disregarding the Cohen appraisal, someone acting on behalf of the partnership made a good faith investigation of the value of the servitude. Mr. Drawbridge gave no convincing testimony on that score." We adhere to that conclusion.

2. *Court of Appeals' Counsel*

In reaching that conclusion, we are mindful of the Court of Appeals' counsel that, where a witness acts as the agent of an entity, he should be able to present the entity's subjective beliefs so long as those beliefs are based on the collective knowledge of the entity's personnel. *See Whitehouse II*, 615 F.3d at 342 (citing *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006)). We are also mindful of the Court of Appeals' observation that, in establishing that it has met its burden of proof for reasonable cause, the taxpayer

must show that it exercised ordinary business care and prudence; also, it is reasonable for a taxpayer to rely on an accountant or attorney for advice as to a matter of tax law, such as whether a liability exists. *Id.* at 342–343. In particular, the Court of Appeals said: "Given that Whitehouse offered proof that it relied on its accountants' and attorneys' opinions of Cohen's appraisal, a possible issue on remand is whether Whitehouse needed to prove more to show reasonable cause." *Id.* at 343. Finally, we are also mindful of the Court of Appeals' observation that, when Mr. Drawbridge testified, he had in front of him the 1997 Form 1065, which had been prepared by the Reznick firm: "It may be that this is direct evidence Whitehouse relied on professional advice in the preparation of the tax form, and such preparation required evaluation of the reasonableness of the stated value of the easement." *Id.* at 342.

### 3. *Petitioner's Burden*

Since respondent concedes the qualified-appraisal requirement,[23] for the partnership to qualify for the section 6664(c) reasonable-cause-and-good-faith exception, petitioner must prove both that (1) before claiming a $7.445 million charitable contribution deduction on the 1997 Form 1065, the partnership in good faith investigated the value of the servitude and (2) it had reasonable cause for, and it acted in good faith with respect to, the resulting underpayment in tax. See section 6664(c)(2)(B) and (1), respectively.

The term "good faith" appears in both section 6664(c)(1) and (2)(B). Although the term has no precise definition, it means, among other things, "honesty in belief". Black's Law Dictionary 762 (9th ed. 2009); *see also Southmark Props. v. Charles House Corp.*, 742 F.2d 862 (5th Cir. 1984). And while section 6664(c)(2)(B) requires a good-faith investigation of the value of the contributed property, neither the Internal Revenue Code nor the pertinent regulations specify what, for

---

[23] The $7.445 million value of the servitude claimed as a charitable contribution deduction on the 1997 Form 1065 was based on the Cohen appraisal, which respondent concedes is a qualified appraisal by a qualified appraiser. As stated *infra* in the text, the Cohen appraisal was concerned only with the Maison Blanche Building, and it did not explicitly take into account any diminution in value of the Kress Building. Since we otherwise conclude that the partnership does not qualify for the sec. 6664(c)(1) reasonable cause exception, we need not concern ourselves with the absence of any qualified appraisal by a qualified appraiser of the Kress Building (or prefiling good-faith investigation of its value). *See* sec. 6664(c)(2).

that purpose, constitutes a good-faith investigation. *See* sec. 1.6664–4(g)(1), Income Tax Regs. (1997) (merely paraphrasing the statute).[24] In discussing the facts and circumstances that may or may not indicate that a taxpayer acted with reasonable cause and good faith, the regulations say this with respect to reliance on appraisals:

Reasonable cause and good faith ordinarily is not indicated by the mere fact that there is an appraisal of the value of property. Other factors to consider include the methodology and assumptions underlying the appraisal, the appraised value, the relationship between the appraised value and purchase price, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer or to the activity in which the property is used. * * * [Sec. 1.6664–4(b)(1), Income Tax Regs. (1997).[25]]

Mr. Drawbridge testified that the partnership relied on the Cohen appraisal in filing out the 1997 Form 1065. By its terms, the Cohen appraisal "is only concerned with the Maison Blanche Building."[26] Mr. Cohen concluded that, as of September 1, 1998, the diminution in value of the Maison Blanche Building caused by the conveyance of the servitude to PRC was $7.445 million. He determined that amount by a before-and-after valuation of the building, as follows:

| | |
|---|---:|
| Value before donation of easement ...................... | $96,000,000 |
| Value after donation of easement ........................ | 88,555,000 |
| Diminution caused by easement .......................... | 7,445,000 |

He stated that, in December 1995, the partnership purchased the Maison Blanche Building for $6.625 million and, in early 1998, it purchased a lease from the Maison Blanche Department Store for $2,353,813. Together, those sums indicate that the partnership paid $8,978,813 for the Maison Blanche Building. And while Mr. Cohen's estimate of the diminution in value of the building on account of the conveyance of the servitude—$7.445 million—must have struck the partners as huge, when compared to what, less than three years earlier, the partnership had paid for the building—$8,978,813 (a diminution in value of approximately 83%)—his estimate of

[24] Currently in sec. 1.6664–4(h)(3), Income Tax Regs.

[25] Same under sec. 1.6664–4(b)(1), Income Tax Regs. (except that the cross-reference is, erroneously, to para. (g) and not to para. (h)).

[26] The Cohen appraisal further states: "Only the historic Maison Blanche Building is the subject of this report."

the before-donation value of the building—$96 million—must have left them thunderstruck when compared to the approximately $9 million that the partnership had so recently paid for the building, indicating that, over less than three years, the building had enjoyed an approximately 970% appreciation. While the Cohen appraisal states that Mr. Cohen was valuing the Maison Blanche Building in an "as improved" condition ("subject to completion of the conversion of the 'shell' buildings into a 452-room Ritz-Carlton Hotel"), it is specific in identifying July 1, 1998, as the date on which he inspected "the vacant building 'shell'" and as the date on which his "*As Is* value estimate shall apply". (Emphasis added.) He does not, however, set forth any "as is" (i.e., unimproved) value for the shell building.

As quoted above, section 1.6664–4(b)(1), Income Tax Regs. (1997), states that reasonable cause and good faith ordinarily are not indicated by the mere fact that there is an appraisal. Among other factors to consider are "the methodology and assumptions underlying the appraisal, the appraised value, the relationship between the appraised value and purchase price". *Id.* When compared to the approximately $9 million that the partnership paid for the Maison Blanche Building in December 1995, Mr. Cohen's opinion that, less than three years later, conveyance of the servitude to PRC reduced the value of the building by $7.445 million would likely suggest to a reasonably prudent taxpayer intending to claim a charitable contribution deduction on account of the conveyance that further investigation of the servitude's value was warranted. And considering Mr. Cohen's failure to set forth a value for the building as an unimproved shell, and his opinion that the value of the building was over tenfold what the partnership had recently paid for it, a reasonably prudent taxpayer attempting to assess its proper tax liability would no doubt have further investigated Mr. Cohen's methodology and conclusions. Lack of further investigation would be counterindicative that the partnership acted with reasonable cause and in good faith in the face of the facts before it. But petitioner does not rely solely on the Cohen appraisal and *does* claim that the partnership further investigated the value of the servitude, which is necessary not only for the partnership to satisfy the section 6664(c)(2)(B) good-faith-investigation requirement but also, on the facts before us, as

evidence that there was reasonable cause for, and it acted in good faith with respect to, the underpayment in tax resulting from its gross misstatement of the value of the servitude.

We shall now consider petitioner's evidence that, besides the Cohen appraisal, the partnership made a good-faith investigation of the value of the servitude.[27]

### 4. *The Revac Appraisal*

We accept Mr. Drawbridge's testimony that the partnership reviewed and relied on the Revac appraisal. Petitioner concedes in its supplemental brief, however: (1) "the REVAC appraisal did not appraise the [servitude]" and (2) "[the partnership] did not rely on the REVAC appraisal as a measure of the value of the servitude". Nevertheless, petitioner argues that the Revac appraisal, which estimates that the fair market value of the Maison Blanche Building would be $125 million upon rehabilitation and $135 million upon achieving stabilized occupancy, as supporting the Cohen appraisal, which concluded that the before-donation value of the building was $96 million:

Any reasonable person making "a good faith investigation of the value of the contributed property" would have viewed the Cohen appraisal, when compared to the earlier REVAC appraisal with respect to a common determination of value—i.e., the unimpaired highest and best use "before" value of the subject property—as expressing a significantly more conservative

---

[27] Petitioner suggests that, if to satisfy the good-faith-investigation requirement of sec. 6662(c)(2)(B), the partnership should have obtained a second appraisal of the servitude, "that is clearly not what Congress intended when it established the rule." Neither we nor respondent has suggested that, to meet the good-faith-investigation requirement of sec. 6662(c)(2)(B), the partnership had to obtain a second appraisal. What a taxpayer must do to meet the good-faith-investigation requirement undoubtedly depends on the sophistication of the taxpayer and the complexity and magnitude of the claimed deduction. *See* sec. 1.6664–4(b)(1), Income Tax Regs. Generally, an owner is competent to give his opinion on the value of his property. *E.g.*, *King v. Ames*, 179 F.3d 370, 376 (5th Cir. 1999); *Babin v. Commissioner*, T.C. Memo. 1992–673, 1992 WL 340738, at *13, *aff'd*, 23 F.3d 1032 (6th Cir. 1994). To carry weight, an owner's opinion cannot be based on naked conjecture or solely speculative factors. *E.g.*, *King*, 179 F.3d at 376. Relying exclusively on his own knowledge, or combining what he knows with verifiable data from a qualified appraisal (such as the appraiser's data about the value of comparables), a donor seeking to satisfy the good-faith-investigation requirement of sec. 6662(c)(2)(B) before he files his tax return might form an opinion as to the value of the contributed property that, on review by the Commissioner or a court, is found to be satisfactory. While determining the value of less than the donor's entire interest in property (e.g., the servitude) may be difficult, the standard to be met is not certainty but only that the value determined be based on a good-faith investigation. And while a second appraisal is not necessary, nor would the mere fact of a second appraisal necessarily constitute a good-faith investigation of the value of the contributed property, given the magnitude of the charitable contribution deduction at stake here relative to the cost of a second appraisal, a second appraisal undertaken in good faith might have been a prudent investment.

conclusion of value and, accordingly, would have no reasonable basis to question the "after" value, or the resultant value of the Easement as expressed in the Cohen appraisal.

The Revac appraisal valued the Maison Blanche Building, not the reduction in value (if any) of that building on account of the conveyance of the servitude to PRC. As we stated in *Whitehouse I*, 131 T.C. at 175:

The flaw in petitioner's argument is that the good faith investigation that * * * [the partnership] was required to make was not an investigation of the value of the Maison Blanche Building but an investigation of the value of the servitude. The before restriction value of a rehabilitated Maison Blanche Building, which Mr. Cohen relied on in his calculation of the diminution in value occasioned by the conveyance of the servitude, is only half the story. Since the Revac appraisal tells us nothing of the other half of the story, i.e., the value of the Maison Blanche Building after the conveyance of the servitude, it does not confirm the $7.455 million value of the servitude arrived at by Mr. Cohen. Indeed, the $125 million postrehabilitation value determined in the Revac appraisal exceeds by slightly more than 30 percent the $96 million postrehabilitation and before restriction value determined by Mr. Cohen, which discrepancy, without more, equally brings into question both appraisals.

Moreover, a more conservative before-conveyance value does not necessarily signify a reasonable value for the servitude itself. Indeed, the Cohen appraisal found a before-conveyance value, based on the income-approach value of $96 million, but a final easement value of $7.445 million, whereas Mr. Roddewig's appraisal started from a lower before-conveyance value ($43 million) but determined a larger easement value ($10 million).

Petitioner begins its discussion of the Revac appraisal by conceding that it was not an appraisal of the servitude and that the partnership did not rely on it to value the servitude. Those are the basic points on which we rely. The Revac appraisal does not constitute an investigation, in good faith or otherwise, of the value of the servitude.

5. *Form 8283*

We also accept Mr. Drawbridge's testimony that a PRC representative signed the Form 8283, acknowledging receipt of the servitude. Petitioner claims that the representative "acknowledg[ed] the charitable donation in the claimed amount". Suffice it to say that the Form 8283 contains the

following disclaimer as part of the donee acknowledgment: "This acknowledgment does not represent agreement with the claimed fair market value."

6. *Investigation*

Other than his testimony that the partnership relied on the Cohen and Revac appraisals, Mr. Drawbridge did not testify to any action by either the partnership or its advisers, the Reznick and Elkins firms, that could be characterized as an investigation of the value of the servitude. He did testify that the Reznick firm prepared the 1997 Form 1065 and that, in filing it, the partnership relied on professional tax advice from both the Reznick and Elkins firms. That much is clear, and we accept it. What is unclear is the substance of that advice and whether, in preparing the 1997 Form 1065, the Reznick firm was duty bound either (1) to ensure that the partnership had made a good-faith investigation of the value of the servitude or (2) to make that investigation itself. To assist us in carrying out the Court of Appeals' mandate, we asked the parties a series of questions. We asked them to identify anything in the record that establishes the content of the professional advice that the partnership relied on in filing the 1997 Form 1065. We asked them to identify authority establishing the duty of an auditor preparing a tax return to evaluate the reasonableness of the stated value of a charitable contribution (and, if there is such a duty, to identify how the duty is to be executed). We asked them to provide us with specific references to the record of testimony (or other evidence) demonstrating a good-faith investigation of the value of the servitude. In particular, we asked them to identify evidence that the partnership's professional advisers made such a good-faith investigation (and conveyed the results of the investigation to the partnership).

Neither party identified any such authority or evidence. The business record rule certainly would have been sufficient to permit Mr. Drawbridge to produce written records prepared by the partnership at the time it filed the 1997 Form 1065 and evidencing the necessary good-faith investigation. *See FDIC v. Massingill*, 24 F.3d 768, 779 n.15 (5th Cir. 1994) (admitting testimony regarding files of which the witness was the subsequent custodian). And, if the Reznick firm or

Elkins firm carried out the investigation on the partnership's behalf, petitioner could have called someone from either or both firms to testify as to the steps taken to investigate the value of the servitude. Indeed, Gary J. Elkins (who we assume was a member of the Elkins firm in 1997 and 1998) is one of petitioner's counsel in this case. The Court of Appeals has said: "In general, a court may draw a negative inference from a party's failure to produce a witness 'whose testimony would elucidate the transaction.'" *Streber v. Commissioner*, 138 F.3d 216, 221 (5th Cir. 1998) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)), *rev'g on other grounds* T.C. Memo. 1995–601. We find that, aside from obtaining the Cohen and Revac appraisals, no one from the partnership did anything else to investigate the value of the servitude. We also find that no one from either the Reznick firm or the Elkins firm did anything to investigate the value of the servitude.

Petitioner attempts to excuse its failure to produce evidence of any investigation of the value of the servitude by arguing that such an investigation was unnecessary:

Whitehouse suggests that the fact that it retained eminently qualified professionals, and relied on their advice and counsel, demonstrates that it exercised "ordinary business care and prudence" in attempting to value the charitable donation and should, *without any further showing*, constitute sufficient evidence that Whitehouse satisfied the requirements of Section 6664(c)(2)(B).

We cannot agree. The requirement of the statute is plain. Besides obtaining and relying on a qualified appraisal by a qualified appraiser, "the taxpayer * * * [must make] a good faith investigation of the value of the contributed property." Sec. 6664(c)(2). For the good-faith-investigation requirement to have any meaning, petitioner was required to demonstrate how, in good faith, the partnership's partners or its advisers could have believed that a $7.445 million charitable contribution deduction was reasonable beyond simply being the amount determined in the Cohen appraisal. There was, however, no testimony regarding how, if at all, anyone reconciled the $7.445 million amount of the deduction (i.e., the value of the servitude) with the approximately $9 million that, less than three years earlier, the partnership paid for the building (an 83% reduction in value). Nor was there testi-

mony regarding any inquiry as to Mr. Cohen's assumption in valuing the servitude that, over less than three years, the building had appreciated in value by approximately 970%. Petitioner's failure to provide evidence that anyone considered those points is indicative that, aside from obtaining the Cohen appraisal, no one made a good-faith investigation of the value of the servitude. That additional step was required here. *See McMurray v. Commissioner*, 985 F.2d 36, 43–44 (1st Cir. 1993), *aff'g in part, rev'g in part* T.C. Memo. 1992–27; sec. 1.6664–4(g), Income Tax Regs. (1997).

### 7. *Reliance on Advice and Counsel*

Nor has petitioner identified, as requested, the content of the professional advice that the partnership relied on in filing the 1997 Form 1065. And petitioner has not shown that, in preparing the 1997 Form 1065, the Reznick firm had either the duty to make an investigation of the value of the servitude or the duty to ensure that the partnership had done so. Finally, petitioner has not identified authority establishing the duty of an auditor preparing a tax return to evaluate the reasonableness of the stated value of a charitable contribution.

We have consulted the American Institute of CPAs Statements on Responsibilities in Tax Practice, AICPA Professional Standards (as of June 1, 1997). TX Section 132 thereof, Certain Procedural Aspects of Preparing Returns, concerns, in part, the applicable standards for CPAs concerning the obligation to verify certain supporting data. In pertinent part, TX Section 132 states:

.02 In preparing or signing a return, the CPA may in good faith rely without verification upon information furnished by the client or by third parties. However, the CPA should not ignore the implications of information furnished and should make reasonable inquiries if the information furnished appears to be incorrect, incomplete, or inconsistent either on its face or on the basis of other facts known to the CPA. * * *

.03 Where the Internal Revenue Code or income tax regulations impose a condition to deductibility or other tax treatment of an item (such as the taxpayer maintenance of books and records or substantiating documentation to support the reported deduction or tax treatment), the CPA should make appropriate inquiries to determine to his or her satisfaction whether such condition has been met.

Rules governing the practice of professionals before the Internal Revenue Service are found in Treasury Dept. Circular 230 (31 CFR sec. 10). Title 31 C.F.R. sec. 10.34(a)(3) ("*Relying on information furnished by clients*") (1994) is virtually the same as TX Section 132.02.

It does not, therefore, appear that under either professional standards or Circular 230 the Reznick firm was required to evaluate the reasonableness of the claimed value of the servitude unless the information furnished it appeared incorrect, incomplete, or inconsistent. There is no evidence of the information provided to the Reznick firm to prepare the 1997 Form 1065, nor does petitioner claim that the information provided to the Reznick firm appeared either incorrect, incomplete, or inconsistent. We shall assume that the information provided to the Reznick firm did not appear to it incorrect, incomplete, or inconsistent. The firm, therefore, was not required, under TX Section 132 or Circular 230, to evaluate the reasonableness of the claimed value of the servitude. And while it may have been required to determine that the Cohen appraisal was a qualified appraisal in order for the partnership to claim a charitable contribution deduction on account of its conveyance of the servitude to PRC, *see* sec. 1.170A–13(c)(2), Income Tax Regs. (1997), the additional investigation of value called for by section 6664(c)(2)(B) was not a condition of the deductibility or tax treatment of the contribution. It was necessary only as an element of any defense based on the section 6664(c)(1) reasonable-cause exception if respondent determined a section 6662 accuracy-related penalty on account of a substantial or gross valuation misstatement. We are not convinced (and petitioner does not argue) that contingency triggers a duty of the Reznick firm to make inquiries to ensure that the condition has been met. A taxpayer may be confident enough in the value of his contribution of charitable deduction property that the risk he attaches to a substantial or gross valuation misstatement is too small to justify the cost of the additional good-faith investigation of value.

The Court of Appeals questioned whether, since the partnership relied on professional advice in the preparation of the 1997 Form 1065, someone had the duty in connection with that preparation to evaluate the reasonableness of the value claimed for the servitude. *Whitehouse II*, 615 F.3d at

342. Except as described, we see no duty, and, on the facts before us, there was no such duty. Petitioner does not argue to the contrary.

Finally, the Court of Appeals asked whether, to show reasonable cause, petitioner needed to prove more than that the partnership relied on its accountants' and attorneys' opinions of the Cohen appraisal. *Id.* at 343. As stated, petitioner has not identified the content of the advice that the partnership relied on in filing the 1997 Form 1065. What were the opinions upon which it relied with respect to the Cohen appraisal? The particular requirement of section 6664(c) at issue here is the requirement of paragraph (2)(B) thereof that, in addition to obtaining a qualified appraisal of the servitude by a qualified appraiser, the partnership made a good-faith investigation of the value of the servitude. Possibly, the Reznick firm or the Elkins firm provided the partnership with an opinion or advice that constituted either part or all of a good-faith investigation of the value of the servitude, but the record is bare of any evidence supporting that conclusion. We are left with petitioner's argument, stated *supra* section V.B.6., that the partnership "retained eminently qualified professionals", on whom it relied, and, "without any further showing", that should be sufficient to show it made a good-faith investigation of the value of the servitude. We do not believe that it is sufficient. Also, we fail to see how petitioner's recitation of results in Tax Court cases helps carry its burden of proving that someone on behalf of the partnership carried out the required investigation.

### 8. *Conclusion*

Petitioner has failed to prove that, in addition to obtaining and relying on the necessary appraisal, it made a good-faith investigation of the value of the servitude. It has, therefore, failed to satisfy the conditions of section 6664(c)(2), which are requisite for the application of the reasonable-cause-and-good-faith exception found in section 6664(c)(1). Nor, for that matter, has it shown that, in relying on the Cohen appraisal, the partnership had reasonable cause for, and it acted in good faith with respect to, the underpayment in tax resulting

from its gross misstatement of the value of the servitude. *See* sec. 1.6664–4(b), Income Tax Regs. (1997).

## C. *Conclusion*

The partnership overstated the value of the servitude on the 1997 Form 1065 by an amount that was more than 400% of the correct value, and, therefore, it made a gross valuation misstatement.[28] The reasonable cause exception provided for in section 6664(c)(1) is inapplicable. We sustain application of an accuracy-related penalty under section 6662(a) on the basis of a gross valuation misstatement.

## VI. *Conclusion*

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

APPENDIX

| | | |
|---|---|---|
| ACT OF DONATION OF PERPETUAL REAL RIGHTS | * * * | UNITED STATES OF AMERICA |
| BY | * * | STATE OF LOUISIANA |
| WHITEHOUSE HOTEL LIMITED PARTNERSHIP | * * * | PARISH OF ~~ORLEANS~~ [LIVINGSTON] |
| TO | * * | |
| PRESERVATION ALLIANCE OF NEW ORLEANS, INCORPORATED d/b/a PRESERVATION RESOURCE CENTER OF NEW ORLEANS | * * * * | |

BE IT KNOWN, that on this 29th day of December, 1997,

BEFORE ME, undersigned Notary Public, duly commissioned and qualified in and for the Parish of ~~Orleans~~ [Livingston], State of Louisiana, therein residing, and in the presence of the hereinafter named and undersigned witnesses:

---

[28] In *Whitehouse I*, 131 T.C. at 176, as reported *supra* p. 314, we stated our conclusion that "[t]he partnership overstated the value of the servitude on the 1997 Form 1065 by more than 400 percent". As reflected above, we should have concluded that the partnership overstated the value of the servitude on the Form 1065 by an amount that was more than 400% of the correct value. That change in wording would not have affected our conclusion that there was a gross valuation misstatement. *See id.* at 172.

PERSONALLY CAME AND APPEARED:

WHITEHOUSE HOTEL LIMITED PARTNERSHIP, (hereinafter referred to as "Owner"), Taxpayer Identification No. * * *, a Louisiana partnership in commendam, appearing herein through its duly authorized General Partner, Whitehouse Hotel, L.L.C., a Louisiana limited liability company, represented herein by its duly authorized Manager, Housing Developers II, L.L.C., represented herein by its duly authorized Manager, J.K.R. Family, L.L.C., represented herein by its duly authorized Manager, Stewart Juneau;

AND

BE IT KNOWN, that on this 23rd day of December, 1997,

BEFORE ME, the undersigned Notary Public, a Notary Public, duly commissioned and qualified in and for the Parish of Orleans, State of Louisiana, therein residing, and in the presence of the hereinafter named and undersigned witnesses:

PERSONALLY CAME AND APPEARED:

PRESERVATION ALLIANCE OF NEW ORLEANS, INCORPORATED d/b/a PRESERVATION RESOURCE CENTER OF NEW ORLEANS (hereinafter referred to as "Donee"), a Louisiana non-profit corporation organized under §1950, Title 12, Chapter II of the Louisiana Revised Statutes (R.S. 12:1950), before Patrick D. Breeden, Notary Public, May 31, 1974, and recorded in the Office of the Louisiana Secretary of State on June 20, 1974, the date that corporate existence began, herein represented by Patricia H. Gay, its Executive Director, duly authorized to act for said Donee;

WHO HEREBY DECLARE, stipulate, covenant, and agree as follows:

WITNESSETH

WHEREAS, Owner possesses full and complete ownership of that certain land ("Land") and the improvement thereon ("Improvement") located in Square 94 of the Second District of the City of New Orleans, Louisiana, which square is bounded by Canal, Burgundy, Iberville, and Dauphine Streets, and more particularly described on Exhibit A attached hereto and made a part hereof (the Land and Improvement are collectively referred to as the "Property"); and

WHEREAS, the Property is shown on that certain survey dated March 17, 1997, prepared by Gandolfo, Kuhn & Associates, Inc. (the "Survey"), a copy of which is attached hereto as Exhibit B and made a part hereof; and

WHEREAS, the Improvement as shown on the Survey consists of a thirteen-story building with the upper seven stories being constructed around a light well facing Dauphine Street;

WHEREAS, the first five stories of the Improvement are referred to herein as the "Lower Stories", and the upper eight stories of the Improvement are referred to herein as the "Upper Stories"; and

WHEREAS, Owner intends to rehabilitate the Improvement and convert it into a luxury hotel and to construct penthouses on the roof of the Improvement (the construction of penthouses on the roof of the Improvement shall be referred to herein as the "Penthouse Addition"); and

WHEREAS, the Penthouse Addition will be constructed in accordance with the approval of the National Park Service of the United States Department of the Interior and in compliance with the Comprehensive Zoning Ordinance of the City of New Orleans, and in any event shall not exceed thirty (30) feet in height above the roof of the Improvement and shall not be closer than twenty (20) feet to the roof parapet nearest to Dauphine Street; and

WHEREAS, Donee is a non-profit corporation, duly established under the laws of Louisiana, operated exclusively for charitable, educational, and historical purposes in order to facilitate public participation in the preservation of sites, buildings, and objects significant in the history and culture of the City of New Orleans, and in furtherance of such purposes is authorized under Section 1252 of Title 9 of the Louisiana Revised Statutes (R.S. 9:1252(A)) to accept grants of perpetual real rights burdening whole or any part of immovable property, including, but not limited to, the facade, exterior, roof or front of any improvements thereof, in order to protect property significant to such history and culture; and

WHEREAS, Owner warrants that there exists no servitude, lease, mortgage, lien or other interest affecting or encumbering the Property which would prohibit, prime, interfere or otherwise limit the effectiveness of any of the rights and benefits herein created by this Act of Donation of Perpetual Real Rights and granted to Donee except as may be disclosed on the public record; and

WHEREAS, the Property has historical and/or architectural merit and contributes significantly to the architectural and cultural heritage and visual beauty of the City of New Orleans and should be preserved; and

WHEREAS, the scenic and architectural facade servitude donated by the Owner to Donee by this Act of Donation of Perpetual Real Rights is created herein for charitable, educational and historical purposes and will assist in preserving and maintaining the Property and the architectural ensemble of the City of New Orleans; and

WHEREAS, to this end, Owner desires to donate, grant, transfer and convey to Donee, and Donee desires to accept, a scenic, open space and architectural facade servitude as a perpetual real right in and to the exterior surfaces of the Improvement.

NOW, THEREFORE, pursuant to R.S. 9:1252, as amended, and in accordance with applicable provisions of the Internal Revenue Code of

1986, as amended, Owner does hereby create, establish, grant, donate, convey and transfer to Donee a perpetual real right (which perpetual real right is more particularly described below) in and to certain exterior surfaces of the Improvement, all of which are owned by Owner (the "Servitude") subject to the right of the Owner to construct the Penthouse Addition on the roof of the Upper Stories and to those rights reserved to Owner in Paragraph 4 hereof.

This Servitude shall constitute a binding servitude, in perpetuity, upon the exterior surfaces of the Improvement; and to that end, Owner covenants on behalf of Owner and Owner's heirs, successors, and assigns, and all subsequent owners of the Improvement with Donee, its successors and assigns, such covenants being deemed to run as a binding servitude, in perpetuity, with the Land, to do (and refrain from doing), each of the following terms and stipulations, which contribute to the public purpose in that they aid significantly in the preservation of historic property:

1. The exterior surfaces of the Improvement subject to this Servitude are the exterior walls of the Lower Stories which are visible from Canal and Dauphine Streets, the exterior portion of the Improvement above the Lower Stories which is not covered by the Upper Stories, the exterior walls of the Upper Stories which are visible from Canal, Burgundy, Iberville, and Dauphine Streets, and the roof of the Upper Stories subject to Owner's right to construct the Penthouse Addition thereon (the "Facade"). In the event of uncertainty, the exterior surfaces of the Improvement visible in the photographs in Exhibit C shall control.

2. Donee acknowledges that Owner has provided to Donee Plans dated August 7, 1997, (the "Plans") pursuant to which Owner intends to renovate the Improvement, including the Facade, and that such renovation and rehabilitation have been approved by Donee, provided such work is in compliance with the Plans. Owner acknowledges and agrees that it shall make certain improvements to the Facade which shall have a cost of at least $350,000. Owner further acknowledges and agrees that in the event any changes or modifications are made to the Plans which affect the Facade, Owner shall first obtain the prior written approval of Donee before any such changes or modifications are made.

3. Owner agrees at all times to preserve and maintain the Facade in a good and sound state of repair.

4. Without the express written permission of the Donee, its successors or assigns, signed by a duly authorized representative thereof, based upon written plans submitted by Owner to Donee, no construction, change, alteration, remodeling, renovation, or any other thing shall be undertaken by Owner or permitted to be undertaken in or to the Facade, which would affect either the height, or alter the exterior of the Facade or the appearance of the Facade, other than as shown on the Plans and the Penthouse Addition, or which would adversely affect the structural soundness of the Improvement. The repair or replacement or reconstruction of any subsequent damage to the Facade which has resulted from casualty loss, deterioration, or wear and tear, shall be permitted without the prior written approval of Donee, provided that such reconstruction, repair,

repainting, or refinishing is performed in a manner which will not alter the appearance of the Facade subject to this Servitude as it is as of even date herewith or as it may subsequently be modified in accordance with the terms hereof. Anything to the contrary notwithstanding in this Act of Donation of Perpetual Real Rights, Owner hereby retains the right (i) to replace any window in the Improvement with a new window which replicates the window which is being replaced so long as Owner does not replace more than ten (10%) percent of the windows in the Improvement and (ii) to affix to the exterior walls of the Penthouse Addition telecommunications devices so long as such devices are mounted as flush to the exterior walls of the Penthouse Addition as possible and are painted a color which is harmonious with the color of the Facade.

5. In all events, Owner, in painting the exterior of the Facade, agrees to obtain the prior written consent of Donee, its successors or assigns, signed by a duly authorized representative thereof, as to the quality and color of paint to be used if significantly different from that presently existing.

6. All work for preserving, maintaining, altering, or renovating the Facade shall be performed and conducted by Owner at Owner's sole cost and expense. Should demolition of the Improvement occur, in whole or in part, other than as provided for in the Plans, or in the event either reconstruction or change, alteration or renovation is performed without the prior written approval of Donee as required herein, Donee shall have the right to require any changes to such work as Donee, in its sole discretion, deems proper. All such construction or changes shall be commenced at Owner's sole cost and expense within sixty (60) days of Donee's written notice to Owner and pursued with diligence until completion, or Donee may compel curative work to be performed at Owner's sole cost and expense, in addition to all rights and remedies provided herein or by law.

7. For the purpose of maintaining and preserving the Facade after it has been renovated and rehabilitated, Donee shall have the right to require the Owner, at Owner's expense, to perform and conduct such repairs and maintenance work reasonably deemed necessary in order to preserve, maintain, or repair the Facade and the structural elements of the Improvement. All such work shall be commenced, at Owner's sole cost and expense, no later than sixty (60) days after Owner's receipt of Donee's written notice, and shall be pursued with due diligence until completion. In the event that said repairs and maintenance work are not completed by Owner within a reasonable time thereafter, Donee may (a) proceed against Owner by summary process in a court of competent jurisdiction to compel such repairs and maintenance, and/or (b) exercise all other rights and remedies provided herein or by law.

8. All rights granted to Donee herein, including such rights which Donee may exercise pursuant to Paragraph 7 above, shall be exercised in a reasonable and prudent manner and with least possible cost to Owner, calculated so as not to interfere with Owner's reasonable use and enjoyment of the Property while accomplishing the purposes of this Act of Donation of Perpetual Real Rights.

9. Owner hereby consents and agrees that representatives of Donee, its successors and assigns, shall be permitted to inspect the Property at all reasonable times upon forty-eight (48) hours prior notice given to Owner. Inspections will normally take place from the street; however, Owner consents and agrees that representatives of Donee, its successors and assigns, shall be permitted to enter and inspect the interior of the Improvement for the purpose of verifying the maintenance of the structural condition and soundness of the Improvement and protecting the rights of Donee herein. Inspection of the interior will be made at a time mutually agreed upon by the Owner and Donee, its successors and assigns, and Owner covenants not to withhold unreasonably its consent in establishing a date and time for such inspection. At least once every five (5) years, Owner, at Owner's cost, shall provide to Donee an inspection report of the condition of the Facade and the structural elements of the Improvement, such inspection report to be prepared by a competent licensed structural engineer, or competent licensed roofer, or both, whichever is applicable. Donee shall have the right to require that the Owner cause an inspection of the Improvement from time to time, upon Donee's reasonable belief that a special inspection is necessary to accomplish the purposes of this Act of Donation of Perpetual Real Rights, including, but not limited to, evidence of deterioration to the Improvement. Within forty-five (45) days after Donee has notified the Owner of the need for a special inspection, Owner shall deliver to Donee an inspection report prepared by a competent person as above-described. In the event that the Owner fails to provide such inspection reports as are required by this Paragraph 9, Donee may, at the Owner's sole cost and expense, employ for the account of Owner the services of a competent licensed structural engineer and/or a competent licensed roofer and shall submit to Owner all bills and other evidence of fees incurred or paid for such services, which shall be promptly paid by Owner.

10. In the event of a fire or other casualty which results in damage to or loss or destruction of a part of the Facade or the structural elements of the Improvement, Owner agrees promptly to repair, renovate, or reconstruct the damaged or destroyed parts of the Facade or the structural elements of the Improvement with the prior consent and approval of Donee as otherwise provided herein.

11. In the event of a total loss or destruction of the Improvement, Owner shall promptly remove all debris and trash and properly maintain the Land. Owner must obtain Donee's written approval of and prior consent to any construction or reconstruction of the Improvement, as provided herein.

12. Owner agrees at all times to carry and maintain such adequate amounts of comprehensive general bodily and property damage liability insurance, property, fire, vandalism, malicious mischief, and extended coverage insurance, general construction liability insurance, and such other standard insurance coverages as may be reasonably required by Donee. The policies of insurance required to be obtained pursuant to this Paragraph 12 shall name Donee as a co-insured as its interest appears herein. If the Improvement is uninsurable, Owner shall provide such other protection which in the reasonable discretion of Donee is necessary and advisable

for the maintenance and preservation of the Improvement, at Owner's sole cost and expense. Donee shall be provided with copies of said policies. Donee shall have the right to provide such insurance at Owner's cost and expense and lien the Property for the cost of the premiums in the event Owner fails to obtain the required policies.

13. Owner shall provide to Donee written notice of the Owner's sale or other disposition of the Property, or any part thereof, at the time of such sale or other disposition or as soon as practicable thereafter, but in no event more than seven (7) days following such sale. Owner shall insert in any agreement to sell the Property (or any part thereof) or in any act of sale of the Property (or any part thereof) a provision expressly setting forth that the Property and the purchaser thereof are subject to and bound by this Act of Donation of Perpetual Real Rights and all covenants, obligations, agreements and restrictions herein. The written notice required to be made by Owner under this Paragraph 13 shall contain the name and address of any purchaser and the name and address of a local agent and attorney-in-fact for an absentee purchaser.

14. In the event the Property is subdivided into condominium units, time-sharing units, or other forms of multiple ownership, Owner and its heirs, successors, vendees or assigns agree to appoint and maintain a single agent and attorney-in-fact residing in the Parish of Orleans with whom Donee shall be authorized to deal exclusively in order to enforce Donee's rights under this Act of Donation of Perpetual Real Rights.

15. Owner agrees to and does herewith grant, transfer and convey to Donee all "development rights" applicable to the Property as provided for in the City of New Orleans Comprehensive Zoning Ordinance other than as shown on the Plans and the Penthouse Addition, as well as all privileges to transfer, sell, or otherwise trade or bargain for such "development rights," in the name of Owner but for the benefit of Donee. Owner agrees to cooperate with Donee as necessary in any such transfer, with all costs of such transfer to be paid by Donee and all benefits therefrom accruing to Donee.

16. No signs, markers, notices, billboards, advertisements, plaques, decorations or other items shall be displayed, erected, mounted or placed on the Facade except as set forth on the Plans or without the prior express written consent of Donee, which consent Donee may withhold in its reasonable and sole discretion.

17. The rights, interests, obligations and benefits herein constitute, individually and collectively, a perpetual real right which vests immediately in Donee upon the execution of this Act of Donation of Perpetual Real Rights and shall be binding on Owner, its heirs, successors and assigns, and on all subsequent owners of the Property. Owner agrees and acknowledges that the Servitude shall have a fair market value at all times that is at least equal to the proportionate value that the Servitude as of the date of donation bears to the total value of the Property as of the date of donation, and that such proportionate value of the Servitude shall remain constant and recognized henceforth and forevermore. Such proportionate value is hereby agreed by the parties hereto to be ten (10%) percent. Owner further agrees and acknowledges that in the event of a

change in conditions which would give rise to the judicial extinguishment of the restrictions and obligations imposed hereunder with respect to the Facade, the Donee, on a subsequent sale, exchange, or involuntary conversion of the Property, shall be entitled to a portion of the proceeds of such sale, exchange, or involuntary conversion at least equal to the constant proportionate value of the Servitude.

18. Donee agrees and binds itself to use all of the proceeds it receives from a sale, exchange, or involuntary conversion of the Property, resulting from a judicial proceeding which extinguishes Donee's real rights, in a manner consistent with the conservation purposes of the original donation.

19. The parties hereto contemplate that the Servitude is a perpetual conservation restriction within the meaning of Sections 1.170–13 and 1.170–14 of the Regulations of the Department of Treasury, and, for federal income tax purposes, the donation of this perpetual real right is the contribution of a qualified real property interest to a qualified organization exclusively for conservation purposes.

20. In the event that the Donee shall at any time in the future acquire full and complete ownership of the Property, Donee for itself, its successors and assigns, covenants and agrees, in the event of subsequent conveyances of such Property to another, to create a new perpetual real right containing the same restrictions and provisions as are contained herein, and either to retain such perpetual real right in itself or to convey such real right to a similar local or national organization whose purposes, *inter alia*, are to promote historic preservation.

21. Any right or obligation imposed upon the Owner of the Property by the Servitude, including any covenant, restriction or affirmative obligation herein, shall be enforceable by the Donee, following reasonable notice to Owner, through judicial proceeding by actions for temporary and/or permanent injunction to enjoin such violations and to require the performance of all obligations imposed on Owner by this Act of Donation of Perpetual Real Rights, or, in the alternative, representatives of Donee, its successors and assigns, may enter upon the Property, correct any violation, and hold Owner and Owner's heirs, successors and assigns, responsible for the cost thereof in an action for damages brought by Donee. Donee, its successors or assigns, shall have available all other legal and equitable remedies permitted by law to enforce Owner's obligations hereunder. In the event Owner is found to have violated any of its obligations arising from this Act of Donation of Perpetual Real Rights, Owner agrees to indemnify and hold harmless Donee from all reasonable attorneys' fees, expert witness charges, and other charges, fees, and costs paid or incurred by Donee in the enforcement of any of its rights granted herein.

22. All other rights of ownership that do not conflict with the exercise of Donee's rights hereunder shall be and are hereby retained by Owner. Owner shall have the right to use the Property and the Improvement for whatever lawful purpose Owner deems necessary, except as to rights herein granted. Owner agrees not to perform any work or make any use of the Property which would adversely affect Donee's full exercise and enjoyment of the perpetual real rights created herein. Owner agrees to pay

all real estate taxes and real property assessments on the Property and agrees to hold Donee harmless in connection therewith.

23. Donee acknowledges that in order to finance the rehabilitation of the Improvement, Owner may sell the Property to a third party and lease the Property from such third party for the term of such financing. In such event, Owner, as lessee of such third party, shall be responsible for all monetary obligations of Owner under this Act of Donation of Perpetual Real Rights. Donee agrees that notwithstanding any provision herein to the contrary, during the term of any such lease from such third party to Owner, Donee shall enforce such monetary obligations solely against Owner or, in default thereof, against the Property, *in rem*.

24. Owner, its successors or assigns, will do and perform at Owner's cost all acts necessary to the prompt filing for registry of this Act of Donation of Perpetual Real Rights in the conveyance records of the Parish of Orleans wherein the Property is located.

THUS DONE AND PASSED in my office at ~~New Orleans~~ [Denham Springs], Louisiana, on the day, month, and year herein first above written, in the presence of the two undersigned competent witnesses, who hereunto sign their names with the said appearers and me, Notary, after reading of the whole.


WITNESSES:                           OWNER:

                                     WHITEHOUSE HOTEL LIMITED
                                     PARTNERSHIP
                                     By: Whitehouse Hotel, L.L.C.
                                        Its: General Partner

_____[signature]_____                By: Housing Developers II, L.L.C.
                                        Its: Manager

_____[signature]_____                By: J.K.R. Family, L.L.C.
                                        Its: Manager

                                     By: _____[signature]_____
                                          Stewart Juneau
                                          Its:  Manager


                _____[signature]_____
                NOTARY PUBLIC

THUS DONE AND PASSED in my office at New Orleans, Louisiana, on the day, month, and year herein first above written, in the presence of the two undersigned competent witnesses, who hereunto sign their names with the said appearer and me, Notary, after reading of the whole.

DONEE:

WITNESSES:

PRESERVATION ALLIANCE OF NEW
ORLEANS, INCORPORATED d/b/a
PRESERVATION RESOURCE CENTER

_____[signature]_____

By: _____[signature]_____
Patricia H. Gay
Its:  Executive Director

_____[signature]_____

_____[signature]_____
NOTARY PUBLIC